976 A.2d 1100 (2009)
409 N.J. Super. 282
TOWNSHIP OF READINGTON, a municipal corporation of the State of New Jersey, Plaintiff-Respondent,
v.
SOLBERG AVIATION CO., a New Jersey partnership, Defendant-Appellant, and
John Hromoho; Thor Solberg, Jr.; Waters McPherson McNeill, P.C.; Fox, Rothschild, O'Brien & Frankel, LLP; Thor Solberg Aviation; New Jersey Department of the Treasury, Division of Taxation; and Township of Readington, Defendants.
No. A-3083-07T3,
No. A-1537-08T3.
Superior Court of New Jersey, Appellate Division.
Argued April 27, 2009.
Decided August 19, 2009.
*1103 Laurence B. Orloff, Roseland, argued the cause for appellant (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Mr. Orloff, of counsel; Mr. Orloff and Philip E. Mazur, on the brief).
James P. Rhatican, Roseland, argued the cause for respondent (Connell Foley, attorneys; Mr. Rhatican and Kevin J. Coakley, of counsel; Mr. Rhatican and Joseph M. Murphy, on the brief).
Before Judges CARCHMAN, SABATINO and SIMONELLI.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
This appeal challenging a condemnation judgment granting, among other *1104 things, title and possession of a portion of defendant Solberg Aviation Co.'s ("defendant" or "Solberg") property to plaintiff Township of Readington ("plaintiff" or "the Township"), raises two critical issues of law. The first is the preemptive effect of state aviation statutes, specifically the Air Safety and Zoning Act (ASZA), N.J.S.A. 6:1-80 to -89, and the State Aviation Act, N.J.S.A. 6:1-20 to -44, and regulations on land use authority. The second is the application of the principles enunciated in Mount Laurel Twp. v. MiPro Homes, L.L.C., 379 N.J.Super. 358, 878 A.2d 38 (App.Div.2005), aff'd, 188 N.J. 531, 910 A.2d 617 (2006), cert. denied, ___ U.S. ___, 128 S.Ct. 46, 169 L.Ed.2d 242 (2007). Defendant claims the taking was pretextual in an attempt to limit the use of airport property. As to this claim, we conclude that defendant presented a sufficient factual basis to overcome a motion for summary judgment; we further conclude that state statutes preempt certain aspects of local land use, constraining a municipality's exercise of its condemnation authority, Garden State Farms, Inc. v. Bay, 77 N.J. 439, 449, 390 A.2d 1177 (1978). In a consolidated appeal, we further conclude that under the Eminent Domain Act of 1971(EDA), N.J.S.A. 20:3-1 to -50, title passed to the Township upon the filing of the Declaration of Taking, and the Township improperly assessed taxes against defendant.

I.

A.
We provide an expansive discussion of both the factual and procedural history of this dispute. Solberg is the owner in fee simple of approximately 726 acres of land in the Township of Readington, Hunterdon County. The property, which is comprised of four contiguous tracts separated by public roads, contains a small airport, farmland, open fields, woodlands, wetlands and stream corridors. Approximately ninety-two percent of the property is farmland assessed. The airport facilities occupy between seventy and 102 acres.[1]
Solberg-Hunterdon Airport (SHA) is a general aviation facility that serves business and recreational users. In 1990, the Federal Aviation Administration (FAA) and the New Jersey Department of Transportation, Division of Aeronautics (NJDOT) designated SHA as a "reliever airport" because of its potential to reduce congestion at Newark Liberty International Airport. In 2000, the National Air Transportation Association named SHA as one of "America's 100 Most Needed Airports."
SHA has one 3,735-foot runway, of which only the first 3,000 feet are paved. It also has several unpaved runways and taxiways, a two-story terminal building, two hangars, numerous airplane parking spaces, a paved automobile parking lot, underground fuel tanks, and a VORTAC[2] navigational aid. Aircrafts that operate at SHA include single and light twin engine piston, turboprop and jet aircraft, gliders, and helicopters. The airport is well known for hosting the Annual New Jersey Hot Air Balloon Festival.
On July 11, 2006, the Township Committee adopted Ordinance 25-2006, authorizing acquisition of defendants' property. The ordinance provided that

*1105 the Township has determined that the public interest will be served by acquisition of the entirety of the Property for public use and purposes, including, without limitation, open space and farmland preservation; land for recreational uses, conservation of natural resources, wetlands protection, water quality protection, preservation of critical wildlife habitat, historic preservation, airport preservation, and preservation of community character....
The ordinance authorized the Township to acquire, through condemnation, a fee simple title to the portion of defendants' property lying outside of the 102-acre airport facilities area. It further authorized the Township to acquire, through condemnation, development rights to the airport facilities area itself. Ordinance 25-2006 reflected the end result of a lengthy and often contentious relationship between the airport and the Township.
In 1939, Thor Solberg, Sr., opened SHA. On February 3, 1941, the Township Committee passed a resolution granting permission for the operation of a commercial airport on the property. Tensions soon arose, however, between the airport and local residents.
In 1967, Governor Richard J. Hughes announced plans to recommend SHA as the site for a fourth metropolitan jetport. In response "[P]olitical, business and community leaders ... gather[ed] forces ... to battle the jetport...." As a result of public pressure, plans to expand the airport to accommodate jets were abandoned.
In 1983, the New Jersey Legislature enacted the ASZA, which authorized the Commissioner of Transportation to adopt rules and regulations to specify permitted and prohibited land uses within airport safety zones. N.J.S.A. 6:1-85 required each municipality that contained any part of an airport safety zone to enact an ordinance incorporating the standards promulgated by the Commissioner. The Township strongly opposed the ASZA, believing that it removed decisions concerning airport expansion from the hands of local officials. It twice petitioned NJDOT for an exemption from the requirements of the ASZA, but its requests were denied. Despite its legal obligation to do so, and repeated prodding from NJDOT, it failed to pass an ordinance that conformed with N.J.S.A. 6:1-85. Rather, it pursued lobbying efforts to have the ASZA repealed and legal efforts to have the ASZA declared unconstitutional. When amendments to the ASZA were proposed in 2000, the Township Committee and numerous local residents submitted petitions asking Governor Christine Todd Whitman to veto the bills.
In the late 1980s, it appeared that Linden Airport might close. A feasibility study prepared by a committee consisting of representatives of the FAA, NJDOT and local officials identified SHA as a potential replacement site. The Mayor of Readington wrote a series of letters that expressed his strong objections to the position taken by the FAA. Despite the Township's opposition, the Solbergs wrote to the Mayor of Linden on May 30, 1990, confirming their willingness to accept the transfer of aircrafts from Linden Airport. Newspaper articles published at this time reported comments from the Mayor concerning the Township's "fallback option" of condemning the Solberg property.
During an August 1990 meeting between Township officials Ron Monaco and Steve Mirota, Township attorney William Savo, and Thor Solberg, the following recorded exchange took place:
[Solberg]: [Y]ou're taking away my livelihood.
[Monaco]: No, we're not.
[Mirota]: Not necessarily.

*1106 [Solberg]: You know that's what  you want to take the land.
[Monaco]: We haven't done that yet.
[Solberg]: It's our land.
[Savo]: Let me tell you what our options are. We could go down ther[e] tomorrow, right? And [take] just enough to put the airport out of business. I wouldn't say anything.
Although the plan to close Linden Airport ultimately fell through, tensions between the Solbergs and the Township persisted throughout the 1990s. In September 1990, the Solbergs requested funding from the FAA for expansion. Shortly thereafter, the main airport runway was extended from 1,800 feet to 3,000 feet. In 1995, the Township Board of Education decided to site a new elementary school immediately adjacent to the airport. This decision drew sharp criticism from NJDOT, which warned that it would not be prudent to locate a school there. Between 1996 and 1999, the Township committee adopted at least five resolutions opposing any increase in SHA's runway length. Members of the Township Committee encouraged local residents to sign petitions and write legislators in opposition to airport expansion.
In 1997, Solberg released a Final Draft Master Plan and an Airport Layout Plan that provided detailed recommendations for airport development, estimated construction costs, and set forth a schedule of improvements over a twenty-year planning period. Among the recommended projects were a new 4,890-foot-long replacement runway, a full parallel taxiway, paving and extension of a crosswind runway, parking facility improvement, additional hangars, an automated weather observation station, a precision instrument approach and an approach lighting system. In response, the Township Committee submitted a lengthy letter to the FAA, NJDOT and numerous government officials "to formally and strenuously object" to the Master Plan.
In March 1999, the FAA and NJDOT gave conditional approval to the Airport Layout Plan, pending the successful completion of an environmental assessment. In April 1999, the Mayor wrote to NJDOT to protest this decision and stated that the Township would "do everything in [its] power to maintain the status quo of [SHA]." At a Township Committee meeting in June 1999, the Deputy Mayor stated that it was "time to draw the line in the sand" and "do whatever it takes right now legally to make sure that [SHA] never becomes a jetport...."
On February 1, 2001, Princeton Hydro, LLC, provided the Township with a "Soleburg [sic] Airport Environmental Assessment Scoping Report," which reviewed SHA's 1997 Master Plan and explained the specific areas that should be addressed by NJDOT's environmental assessment. This report formed the basis of a lengthy submission by the Township to NJDOT on February 9, 2001, that stated the Township's concerns over airport expansion.
In October 2002, NJDOT released a preliminary "Draft Environmental Assessment for Solberg-Hunterdon Airport" (EA). The options studied in the EA were substantially scaled back from the recommendations set forth in the airport's 1997 Master Plan. The EA discussed three possible alternatives to SHA's proposals: (1) the "no-build alternative," where the airfield would retain its current configuration and only rehabilitation of the existing facilities would be allowed; (2) the "modified no-build alternative," which would allow minimum improvements to the facilities without lengthening any of the airport runways; and (3) the "runway improvement alternative," where a 3,735-foot-long replacement runway would be constructed on another portion of the airfield *1107 and the current runway would be converted into a parallel taxiway. The EA noted that the no-build alternative was inadequate from the perspective of the FAA and NJDOT because the existing runway configuration did not meet FAA airport design standards. After discussing the environmental consequences of expansion, the EA summarized the potential impacts of the three alternatives. It concluded that the no-build alternative would have no environmental impacts, the modified no-build alternative would have minimal or indirect impacts and the runway improvement alternative would have slightly more impacts than the modified no-build alternative.
While NJDOT's environmental assessment process was underway, the Township commissioned a study of the threatened and endangered species of grassland birds at SHA, an environmental inventory report on the Solberg property, and an evaluation of the Solberg property for municipal acquisition. On July 9, 2001, the Township amended its 1990 Master Plan to include "policies relating to critical habitat and the Solberg-Hunterdon Airport...." The amendment "recommended that the most effective way to preserve and manage the unique environmental resources and open space on these [the Solberg] tracts be through acquisition by the Township." Notably, the 2001 amendment represented the first time that the Solberg property was specifically identified by the Township as environmentally valuable. The 1990 Master Plan did not list the Solberg property as a "critical environmental impact area." Likewise, the Readington Township Open Space Inventory and Recommendations for Preservation, dated October 23, 1995, failed to identify the Solberg property for future acquisition. The Solberg tract was not included in the list of Greenways properties set forth in the June 2001, Report of the Readington Township Open Space Committee. Although the Readington Township Environmental Resource Inventory, dated April 20, 2001, noted that NJDEP named SHA as a "Natural Heritage Priority Site," it did not identify the airport as being environmentally vulnerable, nor did it recommend its acquisition.
On April 11, 2002, Solberg entered into an agreement with NJDOT for the sale of SHA. The agreement set a base purchase price of $22,000,000, subject to negotiation, and contingent upon obtaining a financing commitment from the FAA. In May 2002, the Township wrote to the Governor's Office to protest the pending sale. It also held several meetings with NJDOT to obtain assurances that the State had no plans to expand the airport facilities, and it received such assurances in a letter from the Commissioner, dated October 29, 2002. The purchase agreement between NJDOT and the Solbergs eventually fell through, however, because the parties could not agree on a final purchase price.
On July 14, 2005, the Township received an appraisal report that estimated the value of the Solberg property at $15,219,700. On August 5, 2005, the Mayor sent a letter of general circulation to Township residents stating that the Township would assume the lead in efforts to acquire and preserve the airport. On September 1, 2005, the Township received a final report prepared by GRA, Inc. on the benefits of municipal ownership of the airport.
A public meeting of the Township Committee was held on January 17, 2006, to discuss the future of SHA. Mayor Gerard Shamey discussed the negotiations that had taken place between the Township and the Solbergs since August 2005, and stated that they had come to an impasse because Solberg "remains committed to lengthening the runways, widening the runways, increasing the thickness of the runways with a view towards attracting a corporate jet business environment and facility." *1108 Mayor Shamey went on to say that "[t]he most important thing to me and to this Committee, and I think all of us on the Committee, is to retain decision-making power over development of the site here in Readington." The Committee then heard a series of presentations from environmental, planning, aviation and acoustical experts who addressed the ecology of the airport site, noise pollution and technical aspects of airport operations. On January 27, 2006, the Mayor sent a letter to Township residents that summarized the presentations of January 17, and stated that the Township Committee was committed to limiting the size of the airport runway to 3,735 feet.
At a public meeting on February 6, 2006, the Committee rejected a suggestion from Suzanne Solberg Nagle that the matter be submitted to a professional mediator and introduced a $22 million bond ordinance to raise funds to acquire the airport property. In a letter to Township residents dated February 14, 2006, the Mayor stated:
Whatever solution is reached, it must preserve the Township's voice in what happens to the character of our community. Recent legal precedents in Florida and elsewhere make clear that once an airport reaches a certain scale, local residents, and in some cases even the airport owners, may have little say in what type of aircraft can use the facility.
At a public hearing on February 21, 2006, the Committee voted unanimously to approve a $22 million bond ordinance. In a February 27, 2006, letter to Township residents, the Mayor stated that the Committee would not submit the matter to a mediator because the question of expanding the runway is not a "split the difference issue." He emphasized that the Township would "not accept any compromise that would expand the runway to more than its current permitted length."
A referendum on the bond ordinance was the subject of a special municipal election on May 16, 2006. Prior to the election, the Township distributed informational materials, including a document titled "Frequently Asked Questions" (FAQ). The FAQ stated that the "Township's goal is to preserve the airport as a small recreational airport, and to protect 625 acres around the airport as open space." The FAQ explained that the Township would not manage the airport, but it "would own the rights to determine future development on airport lands." Local newspapers published editorials by Township officials that urged residents to vote in favor of the bond ordinance in order to stop the airport from becoming a jetport. The referendum passed with an affirmative vote of 55.6%. At the June 28, 2006 Township Committee meeting, the ordinance authorizing acquisition of the airport property was introduced, and as mentioned previously, this ordinance was adopted on July 11, 2006.
On July 17, 2006, the Committee authorized the execution of loan agreements with the New Jersey Environmental Infrastructure Trust (NJEIT) and the New Jersey Department of Environmental Protection (NJDEP) for purchase of the airport property, which was approved on September 12, 2006. The Township's condemnation complaint was filed immediately thereafter.
The complaint was filed against Solberg and others[3] demanding a declaration that the Township had duly exercised its authority to acquire defendants' property by eminent domain and an order appointing commissioners to fix the compensation required to be paid for the taking of the *1109 property. The complaint also sought a declaration that the property's owner is legally responsible for all reasonable and necessary environmental clean-up costs that may arise from remediation of the site and asked the court to withhold disbursement of monies deposited pending adjudication of the environmental issues.
On September 22, 2006, the motion judge signed an order to show cause, directing defendants to file answers or motions within ten days. The judge also ordered that the sum of $21,378,000, which was the Township's estimate of the fair market value of the property, be paid into the court's trust fund unit upon the filing of a declaration of taking. On October 4, 2006, the Township filed a Declaration of Taking and deposited the monies with the Clerk of the Superior Court.
Defendants moved for an order staying the eminent domain proceeding, vacating the order of September 22, 2006, and enjoining the Township from enforcing its declaration of taking, as well as thereafter filing an answer disputing the allegations in the verified complaint and raising numerous affirmative defenses. The answer also asserted a counterclaim against the Township and a third-party complaint against several Township officials that alleged official misconduct, a violation of 42 U.S.C. § 1983, and breach of fiduciary duty and sought relief in lieu of mandamus.
Also on October 20, 2006, Kevin J. Devine and Taxpayers Alliance of Readington filed a notice of motion to intervene in order to request that the court's September 22, 2006, order for payment into court be vacated.[4]
The judge ordered additional discovery and ultimately, she stayed the condemnation complaint and the declaration of taking, allowed the monies deposited by the Township to remain with the court, ordered the Township to immediately vacate the property, ordered defendants not to make any improvements or convey the property, denied Devine's motion to intervene and appointed two special discovery masters to oversee the pretrial proceedings.
Defendants filed a motion for summary judgment, seeking an order declaring that the Township was without authority to condemn the airport property. The Township also filed a motion for summary judgment, seeking an order entering final judgment on its claims and appointing commissioners for the determination of just compensation.
During the course of the litigation, the parties produced numerous reports and certifications from experts in the fields of aviation, valuation, planning, and the environment.
Princeton Hydro, an environmental expert for the Township, described defendants' property and opined that the site's natural resources would be detrimentally impacted by further airport development. Professional Planner Michael F. Sullivan reviewed the characteristics of the Solberg property and concluded that municipal acquisition would result in "multiple and interrelated public benefits" such as preservation of open space, farmland, critical habitat, and community character, and the provision of recreational resources.
Conway Consulting, an airports and aviation consultant, opined that forecasts of future aviation activity in the SHA Master Plan were overly optimistic and that the airport was in poor physical condition. *1110 Richard Golaszewski, a transportation economics expert, noted that "small general aviation airports do not usually generate large profits" and observed that defendants might seek a greater return by selling the property for non-airport uses. Golaszewski opined that SHA could not continue to operate on a long-term basis in its current condition and that money from the taking would provide defendants with the monetary resources to upgrade the airport facilities.
Defendants' experts refuted these opinions. A report prepared by Amy S. Greene Environmental Consultants (ASGEC) stated that the natural characteristics of the Solberg property were virtually identical to those of the Township as a whole and that, in fact, the Solbergs had done a better job of conserving agricultural land use than had the Township. In a second report, ASGEC opined that
[t]he grassland bird population at Solberg Airport is not in imminent danger of being eradicated by airport operations. It is the normal and regular general maintenance activities associated with airport operations that provides the existing habitat that lead to the `National Heritage Priority Site' designation in the first place.
Professional Planner George A. Ritter echoed ASGEC's opinion, stating that the Solberg property "is of the same general character as Readington Township as a whole with regard to the occurrences of wetland, forest, surface waters, floodplains and other natural features.... Further, critical grassland habitat area found on the Solberg Property can be found in abundance in many areas of Readington Township." In a certification, Ritter stated that the amount of open space and preserved farmland in the Township "so greatly exceeds all of the accepted standards for public open space as well as developed recreation land [that] any further acquisition of lands for this purpose cannot be justified as meeting a public need for such facilities but must be for some other purpose."
With regard to the importance and continued viability of SHA, aviation expert Allan R. A'Hara wrote that the facility "serves a vital role as a general aviation reliever airport" and that the taking as proposed "would place substantial limitations on the airport's ability to adequately operate as it does today" and would leave insufficient property to adhere to current FAA guidelines. Another expert, Airport & Aviation Appraisals, concluded that if SHA were reduced to 100 acres and confined to a 3,735-foot runway, it would be unable to make a profit in the current aviation marketplace. Finally, Arlene Feldman, who has served as an FAA Regional Administrator and as New Jersey Director of Aviation, prepared a report and certification asserting that SHA is of "incredible importance to New Jersey and its economy...." Feldman stated that SHA not only contributes to safe airport operations by reducing congestion at other aviation facilities, it also serves as a base from which state and federal authorities can render efficient emergency response and rescue services.
Julia Allen, a long-time member of the Township Committee, prepared a certification in support of the Township's motion for summary judgment. Allen set forth a detailed history of the Township's efforts to preserve open space and farmland dating back to 1978, and explained that the Township had been interested in acquiring the Solberg property for preservation purposes since at least 1999. She described the negotiations between the Solbergs and the Township, which she claimed were unilaterally terminated by the Solbergs in 2006. Allen stated that the purposes set forth in Ordinance 25-2006, "including the *1111 preservation of open space, are not pretexts for any other purpose of the Township Committee to be accomplished by the acquisition of the Property." Allen did not discuss concerns over airport expansion, nor did she cite the ability to control the use of the airport property as a purpose for which the Township decided to acquire defendants' property.
The judge granted the Township's motion for summary judgment and found that defendants had not met their high burden of demonstrating that the Township's motives rose to the level of bad faith. She concluded: "In light of the Township's established and recognized land use authority over the airport, it is the opinion of this Court that the Township of Readington is entitled as a matter of law to condemn the Subject Property, Solberg Airport and the surrounding property, as it proposes."
The judge signed an order giving full force and effect to the Declaration of Taking, vesting the Township with the right to immediate exclusive possession of the property, and appointing commissioners to fix the compensation to be paid to defendants. The order also severed all counterclaims and third-party claims against the municipal third-party defendants. Solberg filed a notice of appeal and the judge stayed the orders for final judgment, stayed the Township's Declaration of Taking, monies previously deposited by the Township remained with the court, the Township was directed to vacate the land owned by defendants and defendants were barred from making improvements, conveyances or encumbrances without the Township's approval. The judge also stayed, pending further order of the court, the provision in the final judgment that severed the counterclaims and third-party claims.

B.
Before addressing the merits of defendants claims on appeal, we must consider first our general standard of review, then unique considerations necessary to a trial court analysis of this multi-parcel condemnation and finally, appropriate considerations regarding plaintiff's authority to condemn.
We first review the standard of review for motions for summary judgment. Summary judgment is appropriate when "there is no genuine issue as to any material fact challenged and ... the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2. "The `judge's function is not himself or herself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986)). When deciding if a genuine issue exists, the court must consider whether the competent evidence, viewed in the light most favorable to the non-moving party, is sufficient to permit a rational fact-finder to resolve the disputed issue in favor of the non-moving party. Id. at 523, 666 A.2d 146. In determining whether a grant or denial of summary judgment was correct, we engage in de novo review and apply the same legal standard as the trial court. Dugan Const. Co., Inc. v. N.J. Turnpike Auth., 398 N.J.Super. 229, 238, 941 A.2d 622 (App.Div.), certif. denied, 196 N.J. 346, 953 A.2d 764 (2008); Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). In so doing, the trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special *1112 deference. Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
Our review of this particular appeal implicates other unique considerations. A critical consideration that must be addressed is the presence of numerous parcels of land involved in this matter and a consideration of why the type of condemnation proposed (fee simple/development rights) was appropriate for each specific parcel. N.J.S.A. 20:3-7(b) allows the condemnation of ten or less parcels of property lying wholly within the same county to be joined in one action, "provided that a separate award, judgment and appeal shall be made, entered and taken with respect to each parcel." See Union County Improvement Auth. v. Artaki, L.L.C., 392 N.J.Super. 141, 148-56, 920 A.2d 125 (App. Div.2007) (discussing the requirements of N.J.S.A. 20:3-7(b) and R. 4:73-6).
The EDA does not define the term "parcel." A review of cases such as Union County Improvement Auth. suggests that for purposes of a condemnation action, a "parcel" is a property identifiable by a specific block and lot number. See, e.g. 392 N.J.Super. at 144, 920 A.2d 125 (each lot number separately addressed in the complaint); 4A New Jersey Practice, Civil Practice Forms § 86.35, at 633 (James H. Walzer) (6th ed. 2006) (sample "Notice to tax collector" of condemnation action requires entry of individual block and lot number). The EDA requires that each lot joined in the condemnation action be addressed with specificity in the court's judgment.
Applying these latter principles, we identify a critical issue requiring further attention. Here, defendants' property consists of 726 acres, which comprise seven lots on the official tax map. These lots are divided among four distinct tracts, separated by public roads. The court made no findings as to which lots host the 102-acre airport facility, which lots fall within NJDOT's airport safety zone, which lots may be impacted by future improvements as contemplated by NJDOT's EA, and which lots consist of open fields or farms that are unaffected by airport operations. Ultimately such findings must be made. See, e.g., City of New Haven v. Town of East Haven, 35 Conn.Supp. 157, 402 A.2d 345 (1977), aff'd, 177 Conn. 749, 419 A.2d 349 (1979) (involving an action to condemn seventy-two acres of land that were part of airport property owned by New Haven. Although the subject tract had unity of ownership and use, the court nevertheless broke it down into three parcels and characterized each parcel according to its function vis-à-vis the airport (i.e., clear zone, transition zone, unutilized)).
The absence of discrete findings tied to specific parcels, or portions thereof, hampers the resolution of this dispute, and our own appellate review. The legal analysis of the Township's authority to condemn the development rights on the lots or portions of lots comprising the airport itself differs from the analysis applied to the Township's authority to condemn fee simple rights to undeveloped property outside of the airport's zone of operations. These are issues that must be resolved with greater clarity.
We now consider the scope of the Township's zoning authority with specific regard to the airport's development and operations.
Solberg Aviation argues that the court erred in concluding that the Township has "established and recognized land use authority over the airport." It contends that the vast bulk of authority to regulate airports resides with the State, as specifically set forth in N.J.S.A. 6:1-29, N.J.S.A. 6:1-85, N.J.A.C. 16:54-2.5, and N.J.A.C. 16:62-2.1. It asserts that the Township misused condemnation to subvert the purposes of *1113 the ASZA and to retain control over the use of airport property.
The Township responds that it retains land use control over the airport and the exercise of that control does not usurp state or federal powers. Relying on MiPro, supra, it argues that it is permissible to condemn property for open space regardless of the property's existing use. It further argues that New Jersey law specifically delegates airport planning decisions to municipalities and claims that defendants' argument concerning the ASZA is a "red herring," because the ASZA has no bearing on the Township's right to condemn the airport property.
The inquiry into whether state or federal statutes and regulations preempt local land use control over airports presents a question of law. In granting summary judgment to the Township, the judge relied on "the Township's established and recognized land use authority over the airport."
Within the United States, air commerce and safety are governed by the Federal Aviation Authorization Act of 1994 (FAAA), 49 U.S.C.A. §§ 40101 to 40129. Under the FAAA, the FAA has exclusive sovereignty over the use of the nation's navigable airspace. 49 U.S.C.A. § 40103(b)(1); see Abdullah v. American Airlines, Inc., 181 F.3d 363, 367 (3d Cir. 1999) (holding that federal law establishes the applicable standards of care in the field of air safety and thus preempts the entire field from state regulation); Allegheny Airlines, Inc. v. Village of Cedarhurst, 238 F.2d 812, 815-16 (2d Cir.1956) (holding that the federal regulatory system preempts the field of control of aircraft flight). The responsibility of the FAA, in conjunction with the Environmental Protection Agency, to prescribe regulations that control and abate aircraft noise has also been established and recognized. 49 U.S.C.A. § 44715; City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 638, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547, 556 (1973).
While the FAA has exclusive control of flight routes and schedules, decisions otherwise concerning the location and operation of airports have generally been left to the discretion of local governments. Hoagland v. Town of Clear Lake, 415 F.3d 693, 698 (7th Cir.2005), cert. denied, 547 U.S. 1004, 126 S.Ct. 1476, 164 L.Ed.2d 249 (2006); Faux-Burhans v. County Comm'rs of Frederick County, 674 F.Supp. 1172, 1174 (D.Md.1987), aff'd, 859 F.2d 149 (4th Cir.1988), cert. denied, 488 U.S. 1042, 109 S.Ct. 869, 102 L.Ed.2d 992 (1989). In Gustafson v. City of Lake Angelus, 76 F.3d 778, 786-87 (6th Cir.1996), the court held that FAA regulations do not preempt local land use control with regard to the location or expansion of airport facilities. It concluded that the fact that the FAA has authority to regulate the use of airspace "`does not of necessity lead to the conclusion that localities are no longer free to regulate the use of land within their borders, even where land use regulations may have some tangential impact on the use of airspace.'" Id. at 789-90 (quoting City of Cleveland v. City of Brook Park, 893 F.Supp. 742, 751 (N.D.Ohio 1995)). These federal decisions are consistent with New Jersey case law holding that federal regulations do not preempt state and local jurisdiction with regard to the placement of private aeronautical facilities. Garden State Farms, Inc. v. Bay, 77 N.J. 439, 449, 390 A.2d 1177 (1978).
Although it is clear that federal law does not preempt the Township's land use authority, the question of state preemption is more complicated. In addressing state preemption, the Garden State Farms Court explained:
A legislative intent to preempt a field will be found either where the state *1114 scheme is so pervasive or comprehensive that it effectively precludes the coexistence of municipal regulation or where the local regulation conflicts with the state statutes or stands as an obstacle to a state policy expressed in enactments of the Legislature.
[Id. at 450, 390 A.2d 1177.]
The Court recognized that the Aviation Act of 1938, N.J.S.A. 6:1-20 to -44, is comprehensive and preemptive, but nevertheless held that "certain responsibilities over the area of land use, development and location of aeronautical facilities" are left to municipalities. 77 N.J. at 451-52, 390 A.2d 1177. In so doing, it noted the "consistent legislative concern for the infusion of local thinking into the decision as to where to locate aeronautical facilities." Id. at 452, 390 A.2d 1177. The Court concluded that
the dominant legislative intent in the Aviation Act is to repose in the Commissioner of Transportation the ultimate authority as to the placement of aeronautical facilities, this predicated upon the mandate that the Commissioner shall "supervise" and "regulate" aeronautics in general and the "establishment, location... size [and] design ... of heliports and helistops" in particular [N.J.S.A. 6:1-29]. We can thus agree with the Appellate Division's observation that while municipalities, consistent with the broad statutory purposes of zoning, N.J.S.A. 40:55D-2, may pass ordinances fixing particular land areas for airports or heliports, or even ban them altogether, they must not exercise their zoning authority so as to collide with expressed policy goals of the State legislation, N.J.S.A. 6:1-20, or the final decision of the Commissioner.
[Id. at 454, 390 A.2d 1177.]
We addressed the preemptive effect of the Aviation Act on local zoning ordinances in Tanis v. Township of Hampton, 306 N.J.Super. 588, 592, 704 A.2d 62 (App.Div. 1997), where a property owner challenged a zoning board of adjustment's determination that he could not use a portion of his property as an airplane landing strip. Id. at 592, 704 A.2d 62. Although we recognized the Commissioner's broad supervisory authority over the regulation and licensing of aeronautical activities and facilities in New Jersey, we concluded that municipal land use control is not totally preempted in light of the Act's requirement that the Commissioner give due deference to local zoning ordinances. Id. at 598-600, 704 A.2d 62.
This case differs from the circumstances presented in Garden State Farms and Tanis as the point of contention here involves the expansion of an existing airport, not the location of a new facility. Further, Solberg Aviation does not argue preemption solely under the Aviation Act but also under the ASZA and its implementing regulations, which require each municipality to recognize an airport as a permitted land use and to incorporate the standards of the Act into its local ordinances. N.J.S.A. 6:1-85; N.J.A.C. 16:62-1.1 to -11.1.
In Patzau v. New Jersey Department of Transportation, 271 N.J.Super. 294, 303-07, 638 A.2d 866 (App.Div.), certif. denied, 138 N.J. 268, 649 A.2d 1288 (1994), we upheld, without addressing preemption, the constitutionality of the ASZA, finding that the act had a rational relationship to a justifiable legislative purpose and that it did not constitute a taking of private property.
To harmonize the apparently conflicting authority, we adopt a balanced approach. Although the ASZA expresses a clear intent that State policies concerning airport operations and development should prevail over local concerns, the regulations require the Commissioner to consider local zoning ordinances when acting on applications *1115 to alter an airport facility. Preemption is not complete but occurs only when "the local regulation conflicts with the state statutes or stands as an obstacle to a state policy." Garden State Farms, supra, 77 N.J. at 450, 390 A.2d 1177. This reasoning is analogous to that employed in Anfuso v. Seeley, 243 N.J.Super. 349, 351, 579 A.2d 817 (App.Div. 1990), where we considered the relationship between municipal zoning power and State regulation of navigable water and tidal lands. We noted that while the State has broad power to regulate property pursuant to the Water-Front and Harbor Facilities Act (WFHFA), N.J.S.A. 12:5-1 to -11, nothing in the WFHFA or in the regulations pursuant to the WFHFA evinces an intent to preempt local land use regulation by municipalities. 243 N.J.Super. at 361-62, 579 A.2d 817. We found that "the legislative design is to allow municipal land use considerations to co-exist with federal and State regulations to the extent that they are compatible. Where, however, local interests collide with expressed policy goals of State and federal legislation local zoning interests must yield." Id. at 363, 579 A.2d 817. We concluded that while local zoning ordinances are not preempted, the municipality's power to regulate the use of property falling under the WFHFA is "narrowly circumscribed." Id. at 366, 579 A.2d 817. See also Township of Franklin v. Hollander, 338 N.J.Super. 373, 769 A.2d 427 aff'd, 172 N.J. 147, 796 A.2d 874 (2002) (holding that the Right to Farm Act, N.J.S.A. 4:1C-1 to -10, preempted municipal land use authority over commercial farms but implementation of the Act requires consideration of land use and zoning considerations).
The same principles apply here. A municipality's ability to regulate land use within an airport safety zone is not entirely preempted by the ASZA. It is, however, narrowly circumscribed because it must conform with the requirements imposed by the regulations. Further, the Commissioner has the ultimate authority to override any local zoning decision if it is contrary to the purposes of the ASZA or the Aviation Act.[5]
The Township's authority to exercise zoning control over defendants' property is therefore constrained by State law. Acquiring development rights to the airport or fee simple ownership of property within the safety zone would provide the Township with greater control over airport operations than it would have through normal application of the zoning law. We now consider whether the proofs reasonably support defendants' claim.
Solberg Aviation argues that the court erred in denying its motion for summary judgment and in granting summary judgment in favor of the Township. It asserts that the condemnation's stated purpose of preserving open space is pretextual and that its true purpose is to exert unlawful, de facto zoning control over airport operations. It maintains that such an improper public purpose requires the court to set the condemnation aside. It supports its position with references to the Township's longstanding opposition to the airport, the Township's saturation with open space, and the Township's failure to dispute that the actual motive for the taking is to prevent airport expansion. It argues that "if the evidence in this case does not, at a minimum, provide sufficient evidence to require a trial on the issue of pretext, then it is submitted that no litigant could ever prove the existence of a pretextual taking."
*1116 The Township responds that the preservation of open space is a legitimate public purpose for which condemnation will be permitted. It contends that a challenge to a taking on pretext grounds is limited to an inquiry as to the consequences of the condemnation, and that the condemning authority's actions will not rise to the level of bad faith unless there is no set of facts that would justify its action. Asserting that the distinction between "purpose" and "motive" is essential, it claims that the motives behind the condemnation are irrelevant as long as the condemnation has a facially lawful purpose. It maintains that its preservation purpose is not only lawful, but is supported by the Township's long history of open space acquisition.
The motion judge concluded that defendants had not met the high burden of establishing that the Township's motives rose to the level of fraud or bad faith.
Defendants presented voluminous evidence of the Township's opposition to airport expansion, beginning in the 1960s and culminating in 2006 with passage of the condemnation ordinance. This evidence consisted of numerous statements by Township officials; minutes of Township Committee meetings; transcripts of Township Committee meetings; Township resolutions; Township planning documents; correspondence between Township officials and state agencies, legislators, and lobbyists; letters sent by Township officials to local residents; depositions of the Solbergs; and transcripts of meetings between local officials and the Solbergs. A review of this record may reasonably lead to the conclusion that the condemnation of defendants' property was motivated, or at least substantially motivated, by the desire of Township officials to limit airport expansion and to prevent SHA from becoming a jetport.
The Township does not contest this conclusion. Rather, it argues that the motives of individual officials are irrelevant because a municipal exercise of eminent domain must be deemed valid if the stated purpose is lawful and achievable through condemnation.
"Eminent domain is the power of the State to take private property for public use. It is a right founded on the law of necessity which is inherent in sovereignty and essential to the existence of government." Twp. of West Orange v. 769 Assocs., L.L.C., 172 N.J. 564, 571, 800 A.2d 86 (2002) (quotation omitted); see also State v. Lanza, 48 N.J.Super. 362, 369-70, 137 A.2d 622 (Law Div.1957) (noting that eminent domain is an inseparable attribute of sovereignty that has been allotted to the legislative branch since the time of the Magna Carta), aff'd, 27 N.J. 516, 143 A.2d 571 (1958). "The [New Jersey] Legislature has delegated broad authority to municipalities to acquire private property by eminent domain for public uses including recreation and open space." Deland v. Twp. of Berkeley Heights, 361 N.J.Super. 1, 19, 824 A.2d 185 (App.Div.), certif. denied, 178 N.J. 32, 834 A.2d 405 (2003). For that reason, "New Jersey courts traditionally have granted wide latitude to condemning authorities in determining what property may be condemned for `public use.'" Twp. of West Orange, supra, 172 N.J. at 572, 800 A.2d 86.
"[A] reviewing court will not upset a municipality's decision to use its eminent domain power `in the absence of an affirmative showing of fraud, bad faith or manifest abuse.'" Id. at 571, 800 A.2d 86; see Casino Reinvestment Dev. Auth. v. Banin, 320 N.J.Super. 342, 346, 727 A.2d 102 (Law Div.1998) (noting that "where the real purpose of the condemnation is other than the stated public purpose, the condemnation may be set aside") (citing Atlantic City v. Cynwyd Invs., 148 N.J. 55, 73, 689 A.2d 712 (1997) and Wilmington *1117 Parking Auth. v. Land With Improvements, 521 A.2d 227, 231 (Del.1986)). "Bad faith is referred to as the doing of an act for a dishonest purpose. The term also `contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will.'" Essex County Improvement Auth. v. RAR Dev. Assocs., 323 N.J.Super. 505, 515, 733 A.2d 580 (Law Div.1999) (quoting Borough of Essex Fells v. Kessler Inst. for Rehab., 289 N.J.Super. 329, 338, 673 A.2d 856 (Law Div.1995)). The party claiming that a municipality acted in bad faith has the burden of proving the improper action by clear and convincing evidence. Id. at 516, 733 A.2d 580.
When considering a claim of bad faith in the context of an eminent domain action, courts traditionally distinguish between the motives of the individuals who adopted the legislation and the purposes of the condemnation itself. Lynda J. Oswald, Article, Public Uses and Non-Uses: Sinister Schemes, Improper Motives, and Bad Faith in Eminent Domain Law, 35 B.C. Envtl. Aff. L.Rev. 45, 57-58 (2008). Unfortunately, "the distinction between motive and purpose often blurs because of the difficulty of categorizing legislative actions." Id. at 60, 733 A.2d 580. Moreover, some courts further confuse the issue by analyzing purpose in terms of motivation. Id. at 58 n. 50, 733 A.2d 580 (citing Wilmington Parking Auth. v. Ranken, 105 A.2d 614, 626 (Del.1954)). Indeed, at least one New Jersey jurist has expressed concern over the "fuzzy line between motive and purpose." Riggs v. Twp. of Long Beach, 109 N.J. 601, 618, 538 A.2d 808 (1988) (Handler, J., concurring). Nevertheless, New Jersey courts continue to observe the distinction between motive and purpose when considering the reasonableness of zoning legislation. Clary v. Borough of Eatontown, 41 N.J.Super. 47, 71-72, 124 A.2d 54 (App.Div.1956).
In Riggs v. Township of Long Beach, supra, 109 N.J. 601, 603, 538 A.2d 808, the Court considered whether a municipality had enacted a challenged zoning ordinance for a valid purpose. The Court acknowledged that "the distinction between motive and purpose can be fuzzy," but explained that "motive" ordinarily concerns the mental processes and subjective considerations that induce a legislator's action, while "`purpose' speaks to the goals to be achieved.... The determination of `purpose' depends on objective factors, such as the terms of the ordinance and its operation and effect, as well as the context in which the ordinance was adopted." Id. at 613, 538 A.2d 808. The Court held that when a party asserts that an ordinance was adopted for an improper purpose, the court's "inquiry should be limited to an evaluation of the objective facts surrounding the adoption of the ordinance." Id. at 614, 538 A.2d 808.
Applying the test set forth in Riggs here, we conclude that the objective factors surrounding the adoption of the condemnation ordinance impugn its validity.
Ordinance 25-2006 states its purposes in acquiring the entirety of the property as "open space and farmland preservation[,] land for recreational uses, conservation of natural resources, wetlands protection, water quality protection, preservation of critical wildlife habitat, historic preservation, airport preservation, and preservation of community character." Further, it states its purposes in condemning development rights to the airport facilities area as "airport preservation, preservation of community character, and to further the purposes for which the Property is to be acquired."
With regard to the taking of development rights for the airport facilities area, it is unlikely that the condemnation will achieve its stated purposes. Reports prepared *1118 by the Township's experts indicate that the airport is in poor physical condition and has limited prospects for future economic success. In his report of April 17, 2007, Golaszewski stated:
Solberg Airport currently serves the market for small general aviation aircraft operations in Central New Jersey. It competes with a number of other airports in the area. It does not handle many jet or turbine operations. The airport, at best, breaks even, and appears to have considerable deferred maintenance in buildings, the airfield, taxiways, and ramps.
Condemnation itself would not change the outlook for the airport unless it led to upgrading of facilities.
[(Emphasis added).]
In a report dated June 29, 2007, Golaszewski noted that airports are much more likely to remain in operation if they are deeded to a public body rather than remaining in private ownership. Likewise, Conway opined that defendants' forecasts of future aviation activity were "overly aggressive" and that the airport's physical facilities were in need of repair. Conway noted that
the owner(s) of the Solberg-Hunterdon Airport has a family history of aviation enthusiasm and remains interested in retaining his investment in the airport as a functioning airport facility. However, as the active principals approach retirement age, there is no assurance that future generations of ownership will hold the same perspectives on the continued operation of the airport based upon the economic returns from operations relative to the land value if sold.
Experts retained by defendants asserted that the proposed condemnation would impair the continued operation of the airport. A report prepared by Airport & Aviation Appraisals on April 18, 2007, concluded:
Our investigation of the economic capacity of Solberg-Hunterdon Airport if the facility is reduced to approximately 100 acres and confined to a 3,735 foot runway as a result of the proposed condemnation produced the following conclusions:
The limitations that would result if the condemnation were successful would leave Solberg-Hunterdon Airport unable to attract the type of aircraft to allow the airport to be viable after the proposed taking.
The basic services that Solberg-Hunterdon Airport will be limited to providing will be maintenance and instruction for light aircraft, along with pilot supplies, parts and fuel for this type of aircraft. The market for Solberg-Hunterdon will be piston engine aircraft. This type of aircraft will not buy enough fuel and will not pay rental rates for T hangers, open bay hangers and tie downs to provide incentive for the ownership to invest money in them, and they have no chance to make the airport profitable.
In his report of April 16, 2007, A'Hara asserted:
FAA design and safety guidelines require that several horizontal and vertical clearance and safety areas be maintained. These areas, including the Runway Safety Area, Obstacle Free Area, and Runway Protection Zone are located adjacent to and/or off the end of each runway. FAA guidelines require that these areas remain clear in accordance with published design standards and that adequate property interest be maintained such that these areas are within the airport property limits. The taking as proposed, leaves insufficient property to adhere to these FAA guidelines.

[(Emphasis added).]
Even when this evidence is viewed in the light most favorable to the Township, *1119 there is no support for finding that the condemnation of development rights will achieve airport preservation and preservation of community character. It is significant that the condemnation, as proposed, will not result in the Township acquiring ownership rights to the airport. Given that the airport is only marginally profitable and the future viability of privately-owned airports is problematic, the fact that the facility will remain under the ownership of the Solbergs casts doubt on its post-condemnation survival. Moreover, the experts agree that SHA is in need of modernization and repair, yet the Township's ownership of development rights will limit the airport's ability to improve the facilities. Limiting the airport's capacity to remain economically competitive is thus at cross purposes to the goal of airport preservation. Even Golaszewski observed that the condemnation will not change the outlook for the airport. Although Golaszewski commented that money obtained from the condemnation could be used to upgrade facilities, this would be true even without the condemnation of development rights since the Township also sought condemnation of non-airport property in fee simple.
The condemnation of development rights will also not "further the purposes for which the Property is to be acquired," i.e., the preservation of open space. The airport facilities area is not open space. It is occupied by runways, taxiways, parking lots, airplane hangers, fuel tanks, and operations buildings. The portions of the airport that are presently unoccupied must remain so under FAA safety requirements. The Township's ownership of development rights has little potential to either increase or preserve open space.
The context in which the condemnation ordinance was adopted also militates against the Township. Although the Township and defendants had been at odds for years concerning airport expansion, serious consideration of condemnation only occurred after Solberg Aviation received conditional approval of its Airport Layout Plan from the FAA and NJDOT in 1999. The Township already possesses large tracts of public open space and recreational land, and it did not even identify defendants' property for possible acquisition until 2001. A public information session convened by the Township Committee on January 17, 2006, included presentations from experts knowledgeable in aircraft design and specifications, aviation regulations and acoustics. In fact, noise analyses were included in several reports considered by the Township prior to passing the condemnation ordinance. In light of this objective context, it appears that the decision to condemn development rights to the airport was tainted by the Township's desire to control airport operations.
The fact that the condemnation of development rights to the airport will not achieve its stated purposes indicates that the true purpose of the condemnation was to secure a greater measure of land use authority over the airport than the Township currently enjoys. Further, objective evidence suggests that the condemnation was initiated to secure Township control over airport operations. These are improper purposes in that they subvert the Commissioner's ultimate authority over aeronautical facilities. See 7 Nichols on Eminent Domain § G2.07[3][c] (3rd ed. 2007) (explaining that a taking may be set aside if it violates existing state regulations).
A similar analysis applies to the parcels or portions thereof lying within the airport safety zone. The record is unclear as to how many of the remaining 624 acres lie within the current airport safety zone or within the safety zone that might result *1120 from implementation of the improvements outlined in NJDOT's environmental assessment. As we have noted, the Township's current authority to exert land use control within the airport safety zone is narrowly circumscribed.
Although the Township states that its purposes in taking this property in fee simple are open space preservation and natural resource conservation, it is not clear that the condemnation will accomplish these goals. The area surrounding the airport is presently farmland and open space; development within the safety zone is strictly limited. Amy S. Greene, defendants' environmental expert, opined that the open areas surrounding the airport have a better chance of remaining in agricultural use and providing wildlife habitat if they remain under defendants' control. Michael Sullivan, the Township's planning expert, concluded that the land immediately around the airport would be appropriate only for passive use and not for active recreation. Vesting the Township with fee simple ownership of property within the airport safety zone would not preserve any open space that is in danger of being developed and would not provide additional recreational land for residents.
Also, as discussed above, the record fairly indicates that the context of the condemnation is suspect. Just as with the airport facilities area, the decision to condemn land within the airport safety zone may be compromised by the Township's apparent ulterior purpose.
The condemnation will not likely achieve its stated purposes; the context of the condemnation reasonably suggests an improper purpose. The grant of summary judgment in favor of the Township's condemnation of property within the airport safety zone must be reversed.
The analysis is different, however, for parcels and portions that fall outside of the airport facilities area and the airport safety zone. While the Township's subjective motives in condemning this additional property might be suspect, its objective purpose in taking a fee simple interest in land unaffected by airport operations is not improper because the Township retains full zoning authority over these parcels. Even if the stated purposes of the condemnation differ from the true purpose, the Township's actions are not illegal, fraudulent or abusive.
This result is supported by MiPro, supra, 379 N.J.Super. at 362, 878 A.2d 38, where we considered whether a municipality's selection of properties for open space acquisition based on its desire to slow residential development constituted an improper use of the eminent domain power. Relying on the "multiple statutory enactments that confer authority upon municipalities to acquire land by eminent domain for preservation of open space and land conservation," we concluded that a municipality may exercise its condemnation authority to acquire open space even if it does not have a present plan to devote the property to active recreational use and even if its true purpose in effecting the taking is to limit growth. Id. at 368-76, 878 A.2d 38. In reaching this result, we emphasized that "this is not a case in which a condemnation action ostensibly brought for a legitimate public purpose, such as acquisition of additional open space, was actually brought for a discriminatory reason or other improper motive." Id. at 377, 878 A.2d 38.[6]
*1121 The Township's decision to condemn parcels falling outside of the airport facilities area and safety zone is completely analogous to the municipality's condemnation efforts in MiPro. Regardless of the veracity of the stated purpose, the objective result of the condemnation is sustainable. The Township's condemnation of parcels within the airport facilities area and safety zone, however, is clearly distinguishable. In MiPro, the court specifically found that the municipality's motives were not improper because concerns over traffic congestion, pollution, stress to the school system and demand on public services are well within a municipality's delegated areas of authority. Id. at 375-76, 878 A.2d 38; MiPro, supra, 188 N.J. at 533-34, 910 A.2d 617. In contrast, the improper purpose in the matter at hand, which is to avoid the limitations on municipal zoning power imposed by State airport statutes and regulations, is not within the police powers delegated to the municipalities by the Legislature. MiPro does not apply in these circumstances.
Solberg Aviation's argument that the Township abused its power of eminent domain in condemning the airport property is supported by relevant authority.
In Borough of Essex Fells v. The Kessler Institute for Rehabilitation, Inc., supra, 289 N.J.Super. at 331, 673 A.2d 856, the court dismissed a municipality's condemnation complaint based on a finding of improper pretext. The municipality did not initially oppose Kessler's proposed purchase of property for development of a treatment facility, but later succumbed to public pressure and passed an ordinance authorizing condemnation of the property. Id. at 333-35, 673 A.2d 856. Noting that "public bodies may condemn for an authorized purpose but may not condemn to disguise an ulterior motive," id. at 338, 673 A.2d 856, the court held:
The extensive record in this case compels the inference that Essex Fells undertook this condemnation action for the sole purpose of preventing Kessler's development of a rehabilitation facility in the community. The credible evidence demonstrates that the public purpose articulated for taking Kessler's property, a public park, was selected not based on a true public need but in response to community opposition to Kessler's proposed use of the property.
[Id. at 339, 673 A.2d 856.]
In Earth Management, Inc. v. Heard County, 248 Ga. 442, 283 S.E.2d 455, 456 (1981), the Supreme Court of Georgia set aside a condemnation undertaken for the stated purpose of creating a recreational park because the evidence showed that the condemnation was actually undertaken to prevent the construction of a hazardous waste disposal facility. In so doing, the court noted that there was no evidence that the land would be used for any purpose other than that of a public park, but at the same time there was considerable evidence that the true reason for the taking was to "thwart the application of another use in which the state has an interest." Id. at 460. The court concluded that "[t]here is no law, statutory, constitutional or otherwise, which clothes a governing authority with the right to utilize the power of eminent domain in order to restrict a legitimate activity in which the state has an interest." Ibid.
Earth Management is directly applicable here. While there is no evidence that the Township will use defendants' property for any purpose other than an airport and open space, there is formidable evidence that the condemnation was initiated to thwart airport expansion. As the operation and control of airports are legitimate activities in which the State has a considerable interest, the Township's unilateral efforts *1122 to restrict those activities can amount to bad faith. See id. at 461 (holding that condemning property for the obvious purpose of preventing a legitimate activity that benefits the public is beyond the power conferred on the county by law).
In Pheasant Ridge Associates Limited Partnership v. Town of Burlington, 399 Mass. 771, 506 N.E.2d 1152, 1154 (1987), the court found that a condemnation purportedly undertaken for the purpose of "parks, recreation, and the construction of moderate income housing" was unlawful and void because the town's true motive was to control the construction of affordable housing on the site. The court observed that bad faith in the condemnation context "includes the use of the power of eminent domain solely for a reason that is not proper, although the stated public purpose or purposes for the taking are plainly valid ones." Id. at 1156. It then found that taking land solely to block the construction of affordable housing was such an improper use. Ibid.
In Franco v. National Capital Revitalization Corporation, 930 A.2d 160, 168 (D.C.App.2007), the court specifically concluded that the United States Supreme Court's decision in Kelo v. City of New London, Connecticut, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), did not preclude a condemnee from demonstrating that the stated reason for a condemnation is pretextual. It noted that

Kelo recognized that there may be situations where a court should not take at face value what the legislature has said. The government will rarely acknowledge that it is acting for a forbidden reason, so a property owner must in some circumstances be allowed to allege and to demonstrate that the stated public purpose for the condemnation is pretextual.
[Franco, supra, 930 A.2d at 169.]
Earth Management, Pheasant Ridge Associates and Franco all refute the Township's argument that an unlawful pretext claim cannot be raised when the condemning authority's stated purpose is preservation of open space and the condemnation will likely achieve that purpose. Along with Essex Fells, these cases make clear that a court will examine the stated public purpose of a condemnation when that condemnation infringes on an important state interest or otherwise suggests a true purpose that is discriminatory or illegal.
In sum, defendants' evidence strongly suggested that the Township's true purpose in condemning the land within the airport facilities area and safety zone was to secure ultimate control over airport growth and expansion. Because this purpose is contrary to express State purposes and beyond the power delegated to the Township by the Legislature, the condemnation of any parcels falling within the facilities area or safety zone must be set aside and determined after a full hearing on the merits. If any parcels fall outside of the facilities area and safety zone, the condemnation of those parcels must be revisited consistent with MiPro.
In sum, we conclude that the judge improperly granted summary judgment to the Township. There is a keen necessity for revisiting the issue of the Township's bad faith in a plenary trial and not by way of motion.
Accordingly we reverse the entry of summary judgment and remand for trial on the issues raised by our opinion including which, if any, of the seven parcels named in the Township's condemnation action fall outside of the airport facilities area and safety zone. The trial court must assess each parcel consistent with this opinion. We likewise conclude that defendants are not entitled to summary judgment. The issue of parcel identification together with the necessity of a plenary *1123 examination of the various written submissions proffered to the Court preclude the entry of judgment to either party.
Notwithstanding MiPro, there is an additional basis for calling this condemnation proceeding into question  the airport's public purpose.
Solberg Aviation argues that the court erred in failing to consider that the current use of the airport property serves an important public purpose. It points out that SHA provides both economic and noneconomic benefits, including its use as a reliever airport to reduce congestion at Morristown, Teterboro and Newark Liberty International Airports. It asserts that the condemnation, as proposed, will eliminate the airport's economic viability and that a lesser taking would suffice to meet the Township's need for open space.
The Township responds that there is no proof that SHA provides a public benefit. It asserts that the "ancient" doctrine of prior public use did not survive passage of the Eminent Domain Act and that, in any event, the doctrine does not apply to a private landowner.
The doctrine of prior use "denies exercise of the power of condemnation where the proposed use will destroy an existing public use or prevent a proposed public use unless the authority to do so has been expressly given by the Legislature or must necessarily be implied." Twp. of Weehawken v. Erie R.R. Co., 20 N.J. 572, 579, 120 A.2d 593 (1956). It is applicable to municipal condemnations of utilities or the land of another municipality, "but it has no place where the condemnor is, in essence, the sovereign, either federal or state." Ibid. When the doctrine is invoked, "a comparative evaluation of the proposed and existing use in terms of public benefit becomes a subject of judicial indulgence to a greater or less degree." Id. at 580, 120 A.2d 593.
In Texas Eastern Transmission Corp. v. Wildlife Preserves, Inc., 48 N.J. 261, 265-68, 225 A.2d 130 (1966), a public utility sought to condemn property belonging to a privately-owned wildlife preserve. The Court explained that the doctrine of prior public use is not applicable when the condemnee is a private entity, because "no comparative evaluation of two public uses, one existing and one proposed," is possible. Id. at 273, 225 A.2d 130. The Township is correct when it asserts that the prior public use doctrine cannot be invoked by a private property owner. This being the case, the question of whether the doctrine survived the passage of the EDA in 1971 is irrelevant.
The Township is incorrect, however, when it claims that defendants failed to prove that SHA provides a public benefit. The expert report and certification of Arlene Feldman strongly supports defendants' contention that the airport serves an important public purpose. Further, courts have long held that the taking of property for the creation of an airport serves a public purpose. 2A Nichols on Eminent Domain § 7.06[13][a] (3rd ed. 2008). Moreover, the Township itself recognized the airport's public benefits when it listed "airport preservation" as one of the purposes of the condemnation.
The situation here is similar to that in Texas Eastern Transmission. Although it did not apply the prior public use doctrine, the Court noted that the wildlife preserve could raise the arbitrariness of the taking as a defense. Texas Eastern Transmission, supra, 48 N.J. at 273, 225 A.2d 130. It held that when raising a claim of arbitrariness, the quantum of proof required of a defendant whose land is devoted to a public use "should not be as substantial as that to be assumed by the ordinary property owner who devotes his land to conventional uses." The Court remanded the *1124 matter with specific instructions to the trial court as to how to balance the parties' competing interests. Id. at 275-76, 225 A.2d 130. In so doing, the Court explained that if the wildlife preserve presented a prima facie case of arbitrariness, the utility would be required to prove that the condemnation was a reasonable and not capricious choice, reasonably calculated to serve the public necessity. Ibid.
The rationale of the Texas Eastern Transmission Corp. comports well with the decision reached in Borough of Essex Fells v. Kessler Institute for Rehabilitation, supra, 289 N.J.Super. at 331, 673 A.2d 856. While we did not specifically cite Texas Eastern Transmission in Kessler when considering the arbitrariness of the Borough's actions, we did engage in essentially the same analysis as that prescribed in Texas Eastern Transmission.
Further, the use of a balancing of public interests test was endorsed by us in MiPro, supra, 379 N.J.Super. at 376-77, 878 A.2d 38. After concluding that the municipality had not abused its condemnation authority, we said:
This is not a case such as Kessler Institute, supra, 289 N.J.Super. 329, 673 A.2d 856, in which the court dismissed an action to condemn property on which the owner planned to construct medical rehabilitation and nursing facilities, or the unreported opinion [[7]] of this court relied upon by respondents that affirmed dismissal of an action to condemn land on which the owner planned to construct a development that would have provided multi-family housing affordable to middle-income families. In those cases, the condemnees' proposed uses of their properties implicated significant public interests, and the courts found abuses of the eminent domain power in the municipalities' attempts to prevent those uses. If Mount Laurel had attempted to condemn Mipro's property when its predecessor in title planned to construct an assisted living facility on the site, a similar finding might have been warranted. However, Mipro's plan to construct a development of single-family homes that will be affordable only to upper-income families would not serve a comparable public interest.
[379 N.J.Super. at 376-77, 878 A.2d 38.]
Defendants submitted substantial evidence to support their claims that the airport provides a public benefit and that the benefit will be impaired or lost if the condemnation proceeds. A genuine issue of material fact exists concerning the arbitrariness of the Township's action.
As part of our previously ordered remand, the court must conduct a trial on defendants' arbitrariness claim. If the court determines that defendants have made a prima facie showing of arbitrariness, then the Township should be required to prove that the condemnation is reasonable and necessary. In analyzing the reasonableness of the condemnation, the court should consider the public purpose served by the airport as compared to the public purpose to be achieved through the condemnation. With regard to necessity, the court should consider the amount of open space already available to the Township, how defendants' property fits into the Township's existing plans for continuous greenways, and whether the Township's goals could be achieved with a lesser taking.
We affirm the judgment's severance of defendants' counterclaim and third party claims, and its denial of defendants' *1125 motion for summary judgment. We reverse the judgment's grant of summary judgment to the Township and we remand for a hearing as to the issues raised in this opinion. We do not retain jurisdiction.

II.
As to the consolidated appeal (A-3083-07T3), while the appeal in Solberg I was pending, the trial court issued an order allowing the Township to withdraw funds that it had deposited with the Trust Fund Unit in Trenton in order to pay post-taking real estate taxes that had been assessed against the Solberg property. On appeal, Solberg Aviation argues that the court erred because title to the property automatically vested in the Township once the declaration of taking was filed. In the alternative, it argues that even if some property taxes are owing, resolution of the issue should be stayed until the Township's authority to effect the taking is ultimately resolved.
We agree that the property taxes were improperly assessed. Pursuant to the EDA, title passes to the condemning authority upon the filing of a Declaration of Taking. Although the court ultimately stayed the eminent domain action, it specifically refused to vacate the Declaration of Taking. Moreover, the court lacked the authority to revest title in Solberg Aviation pendente lite. Accordingly, we reverse.
Solberg Aviation argues that the Township should not have been allowed to assess or collect property taxes against the Solberg property because the filing of the Declaration of Taking placed title to the property in the Township. It asserts that the EDA is "absolutely clear" that title vests in the condemnor immediately upon the filing of the declaration and the depositing of funds into court. It cites statutory and case law authority for the proposition that a condemnee is only responsible for property taxes up until the taking of title by the condemning body. It also points out that the EDA treats vesting of title and right of possession as two distinct concepts and specifically provides that vesting of title, even without possession, serves to cut off the condemnee's property tax responsibility. Noting that the court specifically rejected its motion to vacate the Declaration of Taking, it contends that the court's stay orders did not apply retroactively to prevent the passage of title.
The Township responds that the November 14, 2006 order that stayed the condemnation action prevented the passage of title to the Township. Likewise, it contends that the March 28, 2008 order that stayed the final judgment pending appeal reinstated the status quo and left title with Solberg Aviation. It claims that the situation here is no different from a case in which no declaration of taking has been filed. In addition, it asserts that Solberg Aviation should be judicially estopped from claiming that title vested with the Township in light of its previous position that it retained ownership of the property.
Several provisions of the EDA address the vesting of title in a condemnation proceeding. Each makes clear that the condemning authority acquires title to the property immediately upon the filing of the declaration of taking and the depositing of the estimated compensation with the court.
Concerning the right to possession and vesting of title, the Act provides:
A copy of the declaration of taking and notice of the filing thereof and of the making of the aforesaid deposit, shall be served upon the condemnee and all occupants of the property in accordance with the rules, and proof of such service shall be filed in the action. Thereupon, the right to the immediate and exclusive possession and title to the property described in the declaration of taking shall vest in the condemnor, free and discharged *1126 of all right, title, interest and liens of all condemnees without the necessity of further process provided, however, that the court may, upon application and good cause shown, stay the taking of possession of the land or other property, or authorize possession to be taken upon prescribed conditions.
[N.J.S.A. 20:3-19 (emphasis added).]
Likewise, N.J.S.A. 20:3-21(a) states that "title to the property condemned shall vest in the condemnor as of the ... filing and recording the declaration of taking and depositing funds pursuant to [N.J.S.A. 20:3-17 and N.J.S.A. 20:3-18]." Title to the property revests in the condemnee only upon the entry of a judgment dismissing the declaration of taking. N.J.S.A. 20:3-24.
The only ambiguity in the EDA occurs in N.J.S.A. 20:3-22, which provides: "The pendency of an appeal with respect to any issue other than the authority to condemn, shall not affect the right to possession and vesting of title in the condemnor." The conclusion to be drawn is that the filing of an appeal that does involve the authority to condemn may affect the right to possession and vesting of title. However, when read in conjunction with the other provisions of the EDA and in light of general eminent domain jurisprudence, this provision does not disturb the principle that the condemnor takes title immediately upon filing the declaration and depositing monies into court.
It is clear that the EDA treats vesting of title and right of possession as distinguishable concepts. See, e.g., N.J.S.A. 20:3-26(a)(2). The filing an action that challenges the condemnor's authority to condemn can affect the right to possession since N.J.S.A. 20:3-19 clearly authorizes a court to stay the taking of possession upon good cause shown. Indeed, in Sussex County v. Merrill Lynch Pierce Fenner and Smith, Inc., 351 N.J.Super. 66, 71, 796 A.2d 958 (Law Div.2001), aff'd, 351 N.J.Super. 1, 796 A.2d 913 (App.Div.2002), the court noted that "in the case in which the defendant denies that the condemnor is authorized to take the property, it is appropriate to postpone physical occupancy of the property by the plaintiff until the Court has ruled on the basic validity of the proposed taking."
The filing a challenge to the condemnor's authority can affect the vesting of title; it does not abrogate it. Several decisions construing the federal Declaration of Taking Act, 40 U.S.C.A. § 3114 (formerly 40 U.S.C.A. § 258a),[8] are instructive on this point.
In United States of America v. Herring, 750 F.2d 669, 671 (8th Cir.1984), the court noted that ordinarily the validity of the government's title under a declaration of taking is unconditional and absolute. When an issue concerning the statutory validity of the taking arises, however, the government takes only a defeasible title.[9]Ibid. The holding in Herring is in accord with Catlin v. United States of America, 324 U.S. 229, 241, 65 S.Ct. 631, 637, 89 L.Ed. 911, 920 (1945), where the Court held that the Declaration of Taking Act *1127 confers only a defeasible title in cases where the validity of the taking is at issue. See also, Heirs of Guerra v. United States of America, 207 F.3d 763, 767 (5th Cir.) (holding that "a declaration of taking creates only defeasible title"), cert. denied, 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000); 29A C.J.S. Eminent Domain § 621 (2007) (stating that "[a]n entity that properly exercises the right of eminent domain generally obtains an absolute right, title, and interest in the property").
Like its federal counterpart, the EDA vests title in the condemnor immediately upon the filing of a declaration of taking and the payment of compensation. N.J.S.A. 20:3-21(a). Also like its federal counterpart, it confers only a defeasible title on the condemnor when the validity of the taking is challenged. N.J.S.A. 20:3-22. Here, the Township took defeasible title to the Solberg property on October 4, 2006, when it filed its declaration of taking and deposited the estimated fair market value of the property with the court.
The Township's argument that the court's stay order of November 14, 2006, retroactively divested the Township of title to the property is without merit. First, pursuant to N.J.S.A. 20:3-24, title is only revested in the condemnee when the court enters a judgment dismissing the condemnation action. The stay order did not dismiss the condemnation action nor did it vacate the declaration of taking; it therefore could not have revested title with Solberg Aviation.
More fundamentally, the Township's argument misconstrues the nature of eminent domain proceedings. In Trout v. Commonwealth Transportation Commissioner of Virginia, 241 Va. 69, 400 S.E.2d 172, 174 (1991), the court observed that "the parties to a condemnation proceeding are not in the position of plaintiffs and defendants in traditional actions or suits." Because normal burden-of-proof rules are inapplicable and there is no ultimate risk of non-persuasion, after the proceeding is instituted, the condemnor is in the position of a defendant. Ibid.
In other words, once the Declaration of Taking is filed and monies deposited, the condemnor takes title to the property and must defend that title against the efforts of the condemnee to reacquire it. A stay or temporary cessation of such proceedings could not divest the condemnor of title.
The court's September 22, 2006 order concluded:
As provided in N.J.S.A. 20:3-21(a), upon the filing and recording of the Declaration of Taking and making of the deposit into Court in the amount stated above, Readington shall be vested with the right to the immediate exclusive possession of and title to the interests in the property described in the Declaration of Taking.
The November 14, 2006 order stayed the Declaration of Taking, allowed the Township to leave the monies deposited into court, and "ORDERED that Plaintiff, Township of Readington is to immediately vacate the land owned by the Plaintiffs pending the outcome of this inquiry." The Township argues that this last provision contained a "scrivener's error" and the court clearly meant to say "land owned by the defendants." It is not obvious that this was a scrivener's error since it was, in fact, plaintiff who owned the land at the time the order was signed. Nothing in this order expressed an intent to divest the Township of its title and revest it in the defendants.
The final judgment entered on January 16, 2008, again stated that the "Township is hereby vested with the right to the immediate exclusive possession of and title to the interests in the property described in the Declaration of Taking." Moreover, even if the orders had expressed such an *1128 intent, they would have been beyond the court's authority under the EDA.
Finally, we find no merit in the Township's argument that Solberg Aviation should be judicially estopped from claiming that titled vested in the Township, because defendants took a contrary position during the earlier stages of the litigation. No further discussion is warranted as to the merits of this argument.
Pursuant to the plain language of the EDA and basic principles of eminent domain jurisprudence, it is clear that title to the Solberg property vested in the Township on October 4, 2006, and never reverted to defendants.
N.J.S.A. 54:4-56, in relevant part, provides:
Upon the sale and transfer for a valuable consideration or the acquisition through eminent domain or similar proceedings of any real estate in this state... the seller or owner of the property to be acquired shall be liable for the payment of such proportion of the taxes for the current year upon the property to be conveyed or so acquired as the time between the previous January first and the date of the delivery of the deed by the seller to the purchaser or the date the condemning body acquired its title bears to a full calendar year.
In other words, the condemnee's obligation to pay property taxes ceases when title vests in the condemnor. This interpretation is confirmed by N.J.S.A. 20:3-26, which requires the condemnor to reimburse the owner for the pro rata portion of real property taxes paid subsequent to the date of vesting title in the condemnor. See also Brick Stores, Inc. v. Bridgewater Twp., 4 N.J. Tax 412, 417 (Tax 1982) (holding that property owner was liable for real property taxes assessed up until the date title vested in the condemnor).
Because title to the Solberg property vested in the Township on October 4, 2006, real property taxes could not be assessed against Solberg Aviation subsequent to that date. The court's decision to allow the Township to withdraw funds for the payment of taxes for all four quarters of 2007 and the first three quarters of 2008 is therefore in error. The October 10, 2008 order for withdrawal of funds should be vacated. If the Township has withdrawn money pursuant to this order, it should be directed to return it to the Clerk of the Superior Court.
Since we have determined that Solberg had no responsibility for the taxes, we need not address the argument that the Township lacked authority to apply for a withdrawal of funds.
We conclude that the judge erred in concluding that Solberg was responsible for taxes. The responsibility remained with the Township. The order of the Law Division is reversed and to the extent any monies were expended from the sums on deposit, the judge shall take such appropriate action to reimburse Solberg for any monies improperly paid from such fund.
Reversed in part, vacated in part and remanded.
NOTES
[1] The size given for the airport facilities varies throughout the record. The Township ordinance sets it at 102 acres; the Township's statement of undisputed material facts sets it at seventy acres; an evaluation report prepared for the Township by a professional planning firm sets it at eighty-seven acres; and a site assessment report prepared by an environmental firm sets it at 100 acres.
[2] Very High Frequency Omni-Directional Radio Range Tactical Aircraft Control
[3] Others claiming an interest would share in any proceeds of the condemnation but were not interested in the issues raised by this appeal.
[4] Devine and Taxpayers Alliance of Readington had previously filed a complaint in lieu of prerogative writs that challenged the bond ordinance and referendum providing for the acquisition of defendants' property.
[5] This conclusion is consistent with the legal analysis and summary incorporated as "Appendix G" into the Final Report of the New Jersey General Aviation Study Commission, created pursuant to L. 1993, c. 336.
[6] For an excellent discussion of MiPro as well as the problem of municipalities fabricating a pretextual reason to effect an otherwise lawful taking, see Lynda J. Oswald, Article: Public Uses and Non-Uses: Sinister Schemes, Improper Motives, and Bad Faith in Eminent Domain Law, supra, 35 B.C. Envtl. Aff. L.Rev. at 71.
[7] The court is referring to an unreported opinion in Township of Allamuchy v. Progressive Properties, Inc., A-987-02T3 (App.Div. July 16, 2004), certif. denied, 182 N.J. 149, 862 A.2d 57 (2004).
[8] The wording of 40 U.S.C.A. § 3114(b) is very similar to that of N.J.S.A. 20:3-21(a) in that it states that "[o]n filing the declaration of taking and depositing in the court ... the amount of the estimated compensation ... title to the estate or interest specified in the declaration vests in the Government." The federal act differs from the EDA, however, in that it specifically provides: "An appeal or a bond or undertaking given in a proceeding does not prevent or delay the vesting of title to land in the Government." 40 U.S.C.A. § 3114(e)
[9] A "defeasible title" is "[o]ne that is liable to be annulled or made void, but not one that is already void or an absolute nullity." Black's Law Dictionary 418 (6th ed. 1990).