**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3964-15T4

TOWNSHIP OF READINGTON,
a municipal corporation of the
State of New Jersey,

      Plaintiff-Appellant/Cross-
      Respondent,

v.

SOLBERG AVIATION COMPANY,
a New Jersey partnership,

      Defendant-Respondent/Cross-
      Appellant,

and

JOHN HROMOHO, THOR SOLBERG,
JR., WATERS McPHERSON McNEILL,
PC, FOX, ROTHSCHILD, O'BRIEN
& FRANKEL, LLP, THOR SOLBERG
AVIATION, NEW JERSEY
DEPARTMENT OF THE TREASURY,
DIVISION OF TAXATION, and
TOWNSHIP OF READINGTON,

      Defendants.

_____

Argued January 7, 2019 – Decided March 1, 2019

Before Judges Sabatino, Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0468-06.

Richard P. Cushing argued the cause for appellant/cross-respondent (Gebhardt & Kiefer, PC, attorneys; Richard P. Cushing and Kelly A. Lichtenstein, on the briefs).

Laurence B. Orloff argued the cause for respondent/cross-appellant (Orloff, Lowenbach, Stifelman & Siegel, PA, attorneys; Laurence B. Orloff, of counsel and on the brief; Matthew T. Aslanian, and Xiao Sun, on the brief).

PER CURIAM

Nearly ten years ago, this court remanded this eminent domain litigation to the Law Division after vacating summary judgment that had been improvidently entered in favor of the condemnor, the Township of Readington. We remanded this matter for trial. Twp. of Readington v. Solberg Aviation Co., 409 N.J. Super. 282, 320, 324 (App. Div. 2009).

A marathon non-jury trial ensued, which took place over thirty-nine intermittent days between May 2014 and January 2015. Following that trial, the now-retired judge issued a comprehensive fifty-four-page written opinion concluding that the Township had pursued the condemnation and the taking of

defendants' property rights in bad faith.  The judge accordingly dismissed the condemnation action and awarded defendants counsel fees and litigation costs.

The award was offset by property taxes assessed on a portion of the property, corresponding to the period of time the Township's declaration of taking was in effect.  A different judge determined the amount of the property tax offset.

The Township appeals the judgment dismissing its condemnation action and the associated award of counsel fees and litigation costs.  Defendants cross-appeal the tax offset, arguing it is barred as a matter of law and also was over-calculated to include the value of a residence located on the property.

As to the Township's appeal, we affirm the trial judge's decision and his detailed findings of bad faith.  The findings are supported by abundant credible evidence in the record, and are consistent with the applicable law.  Defendants met their burden of proof in showing that the Township's asserted reason for the taking, i.e., open-space preservation, was pretextual, and that the condemnation was actually motivated to stifle aviation-related activities on the property.

As our opinion will explain, our affirmance of the judgment is without prejudice to the Township's right to pursue, if it so chooses, a new condemnation action against defendants encompassing appropriate portions of defendants'

A-3964-15T4

property, so long as the taking does not conflict with the use of the property for aviation-related activities and an associated buffer zone. The precise boundaries of a permissible future taking must abide an updated development of facts, ideally including testimony from current officials with the state and federal regulatory agencies who can address the airport's projected future role.

As to defendants' cross-appeal, we reject their argument that they are exempt from all property taxes for the period of the taking. However, we vacate the trial court's offset and remand for the limited purpose of fixing a revised assessment that duly reflects defendants' temporary loss of the legal right to use the residence.

## I.

The reader's familiarity with our 2009 opinion and the trial judge's detailed recitation of the long history of this case in his 2015 written opinion is presumed. We briefly summarize the pertinent facts and procedural history, as follows.

### The Solberg Family and the Airport

Solberg Aviation Company ("Solberg") is a New Jersey partnership that owns in fee simple the subject property in Readington Township. The property

A-3964-15T4

spans approximately 726 acres, comprising facilities for the Solberg-Hunterdon Airport ("SHA"), and surrounding farmland and open space.

The partnership's members--siblings Thor Solberg, Jr. ("Thor")[1], Lorraine P. Solberg, and Suzanne Solberg Nagle--inherited the business and property from their father, who had achieved wide recognition for his accomplishments in aviation, including a knighthood by the King of Norway and a designation as a "Great American" by President Franklin D. Roosevelt for his contributions to national security around World War II. He established the airport in 1939, had it recognized by the Township as a "commercial" airport two years later, and acquired for it over the following decades the land now at issue. Since his death, his children steadfastly attempted to keep the airport operating and viable as a going concern.

<u>The Property</u>

SHA is a public use general aviation airport accommodating traffic primarily of smaller aircraft by business and recreational clients. Its facilities comprise one paved and two unpaved runways, a terminal building, two hangars,

---

[1] Thor passed away during the pendency of this appeal. We intend no disrespect in referring to him by his first name to distinguish him from his siblings.

<span style="float:right">A-3964-15T4</span>

and other structures and equipment necessary to the airport enterprise, as well as a house that had been used by Thor as a single-family residence.

SHA has been designated by the Federal Aviation Administration ("FAA") and the New Jersey Department of Transportation ("NJDOT") as a "reliever airport," which may serve to reduce congestion at nearby Newark Liberty International Airport.

SHA's physical structures are all situated within the 102-acre portion of the property the Township designated in its declaration of taking as the "airport facilities area," with the exception of a VORTAC tower, a navigational aid, which lies outside. Surrounding the facilities area is SHA's "airport safety zone," established and made subject to state regulation pursuant to the Air Safety and Zoning Act of 1983 ("ASZA"), N.J.S.A. 6:1-80 to -88, to prevent the creation of airport hazards detrimental to the safe operation of the airport and the public it serves.

The airport safety zone extends beyond Solberg's property, but the portion of it that lies within the property, according to evidence presented by the Township at trial, comprised an area of approximately 408 acres.

Defendants introduced evidence that their property is also used for other aviation-related activities, which occur in whole or in part outside those

highlighted areas. Most prominently, that included an annual hot air balloon festival, which has involved up to 125 balloons on much of the property, including areas of block 56, lot 3, falling outside the facilities area or safety zone. Blimps require a substantial amount of open space and consequently cannot be accommodated by many other airports in the region besides SHA. They have in the past set up "all over the property" and, in particular, have used block 56, lot 3, and block 67, lot 2, the latter of which falls entirely outside the facilities area, for mooring.

In addition, members of a longstanding radio-controlled model airplane club operate their sizable models, which run about as large as an office desk, in an area of block 56, lot 3, that falls outside the facilities area or safety zone.

The bulk of the property surrounding the airport facilities is assessed as farmland. All told, the property comprises approximately 449.585 acres of agricultural lands with 397.776 acres of prime farmland soils, about two thirds of that with soils of statewide importance, 194.967 acres of woodlands, 77.857 acres of wetlands and wetland transition areas, and about 455 acres of grassland species habitat. The property, moreover, spans two stream corridors, specifically those of Holland Brook and Chambers Brook, and serves as a bridge for the movement of wildlife between them. A Township expert identified these,

along with the property's size, as among the reasons the municipality prioritized the property for preservation.

<u>The Township's Efforts with Respect to Open Space Preservation</u>

As mentioned, the Township claimed at trial and maintains on appeal, consistently with the text of its declaration of taking, that the condemnation was meant in large part to foster the preservation of open space. The Township represents approximately one tenth of Hunterdon County's land area, comprising farms, residential suburbs, and historical villages. Roughly forty-five percent of its greater than 30,000 total acres were developed as of the time of trial.

The Township has actively sought, since the formation of an Open Space Committee and approval of a referendum first authorizing the necessary funding in the late 1970s, to acquire open space and farmland for preservation, eventually setting a goal of preserving 8000 acres of farmland but no specific quota for open space. The property at issue here had been identified as a prospect for acquisition for farmland preservation as early as 1979 in the municipality's Open Space Master Plan of that year. As of the time of condemnation, the Township had successfully preserved 11% of its acreage for open space and about 13% as farmland, all through voluntary transactions. As

A-3964-15T4

of the time of trial, those figures rose to about 12% for open space and 17% for farmland preservation.

Circumstances Leading to Condemnation of the Airport

Defendants, meanwhile, maintain that the condemnation was pretextual and that its true, improper purpose was to prevent expansion of the airport. Indeed, tensions between the airport and the surrounding community began as early as 1967, after then-Governor Richard J. Hughes announced an intention to recommend SHA to federal authorities as a fourth metropolitan jetport in the region. Plans for expansion of the airport to accommodate jet traffic were ultimately abandoned in response to public pressure, but hostility arose again in the 1980s, when Solberg applied for and received a grant from NJDOT to extend the pavement on its primary runway from the existing 1800 feet to its full licensed length of 3735 feet. Although the project had already received approval from both NJDOT and the Township, the Township issued a stop work order just before construction began, forbidding the runway from being paved beyond 3000 feet.

Later that decade, the FAA and NJDOT, at the time anticipating Linden Airport's closure in favor of commercial development, considered SHA as an alternative to absorb the traffic. A committee of federal, state, and local officials

conducted a feasibility study on the matter and ultimately recommended that SHA be designated as a replacement site, requiring improvements to the airport, including the full paving of its existing runways and taxiways. Though the Solbergs expressed willingness to have their airport accept the extra traffic and undertake the necessary development, the Township vehemently opposed the plan. Indeed, local newspaper articles reported comments from the Township's mayor openly contemplating the municipality's "fallback option" of condemnation.

In August 1990, as the dispute continued, Thor met with then-Mayor Steve Mirota, as well as Township attorney William Savo and Committeeperson Ron Monaco, at which meeting Savo, in the following recorded exchange, threatened the option of condemnation:

> [Solberg]: [Y]ou're taking away my livelihood.
>
> [Monaco]: No, we're not.
>
> [Mirota]: Not necessarily.
>
> [Solberg]: You know that's what -- you want to take the land.
>
> [Monaco]: We haven't done that yet.
>
> [Solberg]: It's our land.

[Savo]: Let me tell you what our options are.  We could go down ther[e] tomorrow, right?  And [take] just enough to put the airport out of business. I wouldn't say anything.

[Emphasis added.]

Plans for the closure of Linden Airport never came to fruition.

In July 1993, NJDOT authorized an Airport Master Plan Study for SHA and invited the Township to participate in the process, explaining that community involvement and input would be "important aspects of that . . . study."  In April 1996, while the study remained ongoing, the Township Committee passed a resolution protesting the findings of several interim reports, fretted that SHA might transition to commercial activities, and stated that a commercial airport was a "highly inappropriate" enterprise in a "totally rural residential zone."  The resolution further made clear that the Committee "strongly oppose[d] any increase in [SHA's] runway length," as well as "any type of commercial expansion that would increase the use of turbine powered aircraft."

Another resolution followed in February 1997, challenging conclusions drawn in the same interim reports, as well as a recent master plan draft.  Again, the Committee took issue "most notably [with] the need for a longer runway," asserting that the "runway length as it exist[ed] provide[d] adequate safety for

11

existing aircraft," characterizing suggested improvements as creating a "commercial airport in a totally rural residential zone," and reiterating that that placement would be "highly inappropriate." It "strongly" invited the county freeholder board to likewise pass a resolution opposing the airport's "proposed expansion."

During the comment period for the master plan, the Township submitted extensive objections, stating that it "formally and strenuously" objected to the master plan conclusions. The Committee passed yet another resolution in May 1997, this time objecting specifically to the FAA's plan to increase the number of flights utilizing the VORTAC at SHA, and another in February 1998 more broadly opposing "any expansion" of the airport.

Tensions continued to flare after the FAA granted conditional approval to the airport's layout and master plans in October 1998. At a January 1999 Committee meeting, the mayor promised to "continue to take bold steps to control unwanted growth," including by "continuing to hold the line against the expansion" of SHA, and the Committee authorized additional legal fees in anticipation of litigation regarding the master plan. After NJDOT followed in conditionally approving the layout and master plans, the mayor wrote a letter to the agency expressing her and the Township Committee's "shock and disbelief"

12

at the decision and characterizing the master plan as "inadequate, self-serving, and in many instances inaccurate and misleading." Notably, she added:

> We are convinced that we are within our rights as a Township in a state devoted to Home Rule, to defend the future health, welfare and safety of our community, and to maintain our rural atmosphere. We will not allow the degradation of our environment, as this proposed airport expansion is most certain to do. We, in conjunction with our neighbor Branchburg Township, will do everything in our power to maintain the status quo of Solberg Airport.
>
> [Second emphasis added.]

Over the next few months, Township officials discussed the master plan's conditional approval and its consequences with residents at two successive Committee meetings, assuring at one that there was no credible threat of residential development on the airport property as an alternative to expansion and that, while the Township was "happy to be the host municipality for a quaint recreational airport," officials would "draw a line in the sand" with regard to any expansion. At around the same time, the Township updated its official website with information about the Branchburg/Readington Airport Action Coalition (BRAAC), a group opposed to airport expansion, and formally retained a law firm explicitly for services "[p]ertaining to [a]cquisition of [l]and."

A-3964-15T4

In September 1999, the Township passed a resolution opposing an assembly bill intended to prohibit the assessment of local property taxes on property occupied by small private airports in favor of state taxation, lamenting that the legislation would expand the reach of NJDOT's powers and encroach on the "home rule" exercised by the municipalities in which such airports were situated. It passed another resolution the following summer opposing on similar grounds other proposed legislation meant to authorize NJDOT's acquisition of development rights for certain public use airports, pointing out that the legislation made no provision for municipal approval, input, or even notification, and characterizing the bill as a "travesty against the citizens of New Jersey."

The Township ultimately announced notice of an intent to take the Solberg airport property by eminent domain in October 2000. It adopted a relevant amendment to its master plan the following July and solicited expert reports evaluating the property and recounting the benefits of municipal acquisition. In response, the Hunterdon County Agricultural Board held a public hearing and ultimately released a report opposing the condemnation and concluding that the proposed taking would have a negative impact on both the operation of the airport and the Township's farmland preservation program. The county

14

freeholder board also opposed the planned condemnation and, in a resolution to that effect, "respectfully urge[d]" the Township "not to condemn the airport under the guise of [o]pen [s]pace or [f]armland [p]reservation" (emphasis added).

The Township persisted nevertheless and enacted Ordinance #27-2001 in October 2001, authorizing condemnation of the property, but it initiated no action and rescinded the ordinance the following year after Solberg reached an agreement for sale of the airport with NJDOT, subject to necessary approval. After the sale fell through a few years later, the Township introduced and then quickly withdrew a bond ordinance ahead of the November 2005 election to fund acquisition of Solberg's property in its entirety.

Yet potential expansion of the airport remained prominent among the issues of that year's municipal election campaigns. Committeeperson Julia Allen circulated campaign literature imploring voters to "stop the [a]irport's expansion," including a flyer urging citizens to vote for her and, by extension, "NO ON AIRPORT EXPANSION." The flyer elaborated:

> Committeewoman Julia Allen and Mayor Frank Gatti stand with the residents of Readington who have spoken out strongly against the planned expansion of Solberg Airport.

15

With airport expansion sure to destroy Readington's environment and quality of life, Allen and Gatti are currently negotiating to maintain Solberg as is.

It concluded "Vote to keep jet traffic out of Readington. Vote Frank Gatti and Write-in Julia Allen."

The issue, moreover, was discussed at a well-publicized Township Committee meeting soon after the election in January 2006. There, Mayor Gerard Shamey explained that the reason recent negotiations between the Township and Solberg concerning the airport had come to an impasse was that "it appear[ed] that Solberg Aviation remain[ed] committed to lengthening the runways, widening the runways, increasing the thickness of the runways with a view towards attracting a corporate jet business environment and facility." Later, he candidly added:

> The most important thing to me and to this Committee, and I think for all of us on the Committee, is to retain decision-making power over development of the site here in Readington . . . . The thing with airports is they are unique, and once an airport is approved to handle certain types of aircraft, once an airport receives funding from the [f]ederal [g]overnment, that is the FAA, a great deal of control, if not total control is lost to the Township. Once those funds are received from the federal government, restrictions become much more difficult with operations and such . . . .
>
> [Emphasis added.]

16

Testimony from a Township aviation consultant at the same meeting likewise emphasized the loss of local control that could attend expansion of the airport with authorization and funding from relevant federal and state authorities. The Mayor sent a letter to residents a few weeks later summarizing the discussion at the meeting and reiterating that if Solberg "accept[ed] federal funding for improvements, there [would be] an FAA preemption of local controls."

At its following meeting on February 6, 2006, the Township Committee approved a resolution authorizing its counsel to take certain steps in anticipation of condemnation and introduced a $22-million bond ordinance for funding the municipality's acquisition of SHA. It then adopted the bond ordinance at its February 21, 2006, meeting, at which Mayor Shamey again reiterated his concerns for the municipality's power over the airport with regard to state and federal authority.

Ahead of the ensuing referendum, the Township's public relations consulting firm, retained not long before the Township began undertaking formal steps toward condemnation, issued a "[s]trategy" memo suggesting, among other things, that Readington representatives advocate that an affirmative vote on the referendum would "stop[] outsiders from taking over our government." The firm also prepared two "frequently asked questions"

17

documents, which the township distributed to the public prior to the election, and which included the following response to the inquiry of whether the Township could "regulate or prevent development at the airport without buying these rights":

> [Municipal] decisions are subject to review and overrule by NJDOT, and in some cases the FAA . . . . Two recent New Jersey court decisions have upheld the supremacy of state priorities over local concerns . . . . So long as the Solberg family owns the rights to develop their property, they are free to pursue an expansion of the airport into a regional jetport. The Township's legal counsel has explained at public hearings that acquiring land and development rights is the only way for the Township to guarantee that the airport is preserved as it is today.

The bond referendum ultimately passed with an affirmative vote of 56%, and the Township adopted the ordinance authorizing the taking and spawning this litigation on July 11, 2006.

### The Township's Filing of a Complaint in 2006

The Township filed a verified complaint on September 15, 2006, to acquire by condemnation the development rights to the approximately 102-acre portion of Solberg's property comprising SHA's "airport facilities" and fee simple title to the 624-acre balance of the property. It filed a declaration of taking to that end and deposited $21,378,000, representing its estimate for the

fair market value of the property, into the Superior Court Trust Fund Unit on October 4, 2006.

Defendants Solberg and Thor (collectively, defendants) filed an answer, counterclaim, and third-party complaint[2] on October 20, 2006.

The 2008 Summary Judgment Rulings

On October 26, 2007, after discovery had been completed, both sides filed motions for summary judgment. The trial court issued a written opinion and pair of orders on January 16, 2008, granting the Township's motion and denying defendants' own motion, thereby permitting the condemnation to proceed, but granted a stay of her decision pending appeal. Defendants timely appealed.

---

[2] Defendants' counterclaim and third-party complaint requested, among other things, a mandatory injunction requiring the Township and its committeepersons to enact, in compliance with the ASZA, an ordinance designating the airport as a conforming use on the land it occupies. The Township enacted an ordinance purportedly conforming with that legislation, which ordinance became the subject of a prerogative writ action by Solberg and, in turn, an interlocutory appeal, Docket No. AM-106-16T4, that the Township sought to consolidate with this one. We denied its motion for leave to appeal, and denied its motion to consolidate without prejudice to any similar application it might bring upon resolution of the prerogative writ action. That action has since been disposed of below, and our docketing system shows no record of any appeal.

<u>This Court's 2009 Reversal</u>

In our published opinion issued on August 19, 2009, we reversed the grant of summary judgment to the Township, affirmed the denial of summary judgment to defendants, and remanded the matter for trial. <u>Solberg Aviation Co.</u>, 409 N.J. Super. at 320, 324.

<u>The Remand and the Marathon Trial</u>

Following considerable motion practice entailing two unsuccessful attempts by the Township to amend its complaint and the dismissal of three of defendants' four counterclaims in favor of their resolution in the parallel prerogative writ matter, Judge Paul W. Armstrong presided over trial in this condemnation action from May 8, 2014, to January 22, 2015.

<u>Judge Armstrong's May 2015 Opinion</u>

Judge Armstrong issued a lengthy opinion on May 4, 2015, finding that the condemnation was invalid in its entirety, revesting fee simple title in the property to Solberg, and granting other related relief, and entered an order to the same effect on May 20, 2015.

The judge concluded that the evidence surrounding the condemnation ordinance "clearly and convincingly" demonstrated that its stated reasons were merely a "pretext for Readington Township's true purpose, which was to limit

the airport's capacity to remain economically competitive and to limit its expansion."

Specifically, the judge cited evidence of the Township's longstanding hostility to the airport and its efforts to oppose any expansion during the years leading up to condemnation, particularly the chain of events following the release of the final master and airport layout plans. The judge thoroughly recounted testimony from Township officials involved in initiating the condemnation action, and notably found, in the context of the record and in light of his own observations of the witnesses' demeanor, their testimony "un-forthright, evasive, untrustworthy, argumentative, [and] lacking credibility." Indeed, he concluded their testimony "reveal[ed] a studied attempt to obscure the true purpose of the condemnors in the instant taking."

Judge Armstrong went on to consider defendants' claim of arbitrariness, finding that the Township's purported goal of open space preservation was a valid public purpose, albeit not the true one. He found that, in light of substantial expert testimony introduced at trial, the Township's asserted purpose did not outweigh the significant public benefit conferred by the airport. The evidence did not show that the taking was either reasonable or necessary,

particularly in light of the abundant open space already preserved in the municipality.

The judge concluded his analysis with these important findings:

> Regardless of whether certain parcels are preempted by state law and others are open to condemnation under open space designation, it is clear . . . that the objective evidence depicts nothing less than deliberate subterfuge on the part of Readington Township in its efforts to obfuscate the desire to preclude airport expansion under the auspices of environmental policy.

The Township's bad faith in that regard thus gave rise to a "manifest abuse of the power of eminent domain," which warranted invalidation of the entire condemnation.

The trial judge denied the Township's motion for reconsideration on June 10, 2015.

Post-Trial Issues

With respect to the two primary issues that remained outstanding, the court appointed a special master to determine the quantum of fees and expenses due to defendants for the failed condemnation pursuant to N.J.S.A. 20:3-26(b), and ordered an appraisal of the value of the 102-acre facilities area to the extent left unencumbered by the Township's declaration of taking and the consequent property taxes due while the declaration of taking remained in effect.

The parties ultimately entered into a consent order on January 22, 2016, fixing the fee award at $3,027,705, consistently with the special master's report and recommendation, and a different trial court judge entered an order on March 29, 2016, awarding a net credit of $206,916.42 against that figure to account for property taxes, as calculated in light of the appraisal. The judge entered an order awarding additional attorney fees and expenses to Solberg, thus resolving the only issue that remained outstanding, on April 6, 2016.

The Township appealed. Solberg filed a cross-appeal, challenging only the assessment of property taxes.

## II.

We begin with a discussion of the Township's appeal. Represented by new counsel, the Township argues the trial judge erred in concluding this condemnation action was brought in bad faith and that its effort to take Solberg's future development rights is arbitrary and capricious. The Township claims the judge's findings are contrary to the weight of the evidence and inconsistent with legal principles.

Among other things, the Township argues the judge erred in two evidentiary rulings: (1) excluding from consideration a transcript of an interim decision of a different trial judge (who, parenthetically, is also now retired) in

an oppressed shareholder dispute among the Solberg siblings[3]; and (2) admitting "net opinions" presented in testimony from Solberg's aviation expert, Arlene Feldman.

The Township further argues that the judge's finding of bad faith did not suffice to undermine the entire condemnation. It asserts the judge failed to carry out our direction on remand to determine which portions of the property fell inside or outside the airport facilities area and safety zone and to evaluate Solberg's challenge to the condemnation with respect to each portion accordingly.

Additionally, the Township asserts the condemnation did not conflict with any superseding interest of state or federal aviation authorities concerning the regulation or development of the airport, that the condemnation would achieve its stated purposes of airport and open space preservation and conservation, and that the condemnation was otherwise reasonable and necessary.

We have carefully considered each of these arguments. In doing so, we have been keenly mindful of the well-established principle that a trial judge's findings of fact after a bench trial are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record. Rova Farms

---

[3] Nagle v. Solberg, Docket No. HNT-C-14022-11 (Ch. Div. May 5, 2014).

Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). That is particularly so where those findings depend on the court's credibility determinations made after a full opportunity to observe the witnesses testify, Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 367-68 (1999), or, more broadly, on its "feel of the case," State v. Johnson, 42 N.J. 146, 161 (1964). By contrast, a trial court's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference," and are subject to de novo review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Having applied these principles of appellate review, we affirm the trial court's invalidation of the Township's present condemnation action, substantially for the cogent reasons articulated in Judge Armstrong's comprehensive written opinion. The judge's decision is legally sound and amply supported by substantial evidence in the record. His evidentiary rulings were not an abuse of discretion, and his analysis of the proofs was logical and clear. We do add several comments and caveats.

As we recognized in our opinion remanding this case a decade ago, the Eminent Domain Act ("EDA"), N.J.S.A. 20:3-1 to -50, confers broad authority on municipalities to acquire private property for public use by eminent domain.

Solberg Aviation Co., 409 N.J. Super. at 310 (citing Deland v. Twp. of Berkeley Heights, 361 N.J. Super. 1, 19 (App. Div. 2003)). That authority can include the purpose of preserving land for open space. Mount Laurel Twp. v. MiPro Homes, L.L.C., 379 N.J. Super. 358, 371-72 (App. Div. 2005), aff'd, 188 N.J. 531 (2006).

Our courts "traditionally have granted wide latitude to condemning authorities in determining what property may be condemned for 'public use,'" Twp. of W. Orange v. 769 Assocs., 172 N.J. 564, 572 (2002), and, in particular, accord a presumption of validity and considerable deference to a municipal ordinance authorizing condemnation, Borough of Essex Fells v. Kessler Inst. for Rehab., Inc., 289 N.J. Super. 329, 337 (Law Div. 1995). Such a presumption may be overcome by an "affirmative showing of fraud, bad faith[,] or manifest abuse." Twp. of W. Orange, 172 N.J. at 571 (quoting City of Trenton v. Lenzner, 16 N.J. 465, 473 (1954)).

As we reaffirmed several weeks ago in Borough of Glassboro v. Grossman, ___N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 17), a municipality's eminent domain powers are not boundless, and the municipality cannot "take a parcel arbitrarily or capriciously, or based on fraudulent conduct or bad faith motives." See also Casino Reinvestment Dev. Auth. v. Birnbaum,

26

___ N.J. Super. ___ (App. Div. 2019) (applying similar principles to an eminent domain action by a state agency).

The term "bad faith," as pertinent here, "generally implies the doing of an act for a dishonest purpose" and "'contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will.'" Essex Fells, 289 N.J. Super. at 338 (quoting Lustrelon Inc. v. Prutscher, 178 N.J. Super. 128, 144 (App. Div. 1981)). That said, when entertaining a claim of bad faith specifically in the condemnation context, our "courts traditionally distinguish between the motives of the individuals who adopted the legislation and the purposes of the condemnation itself." Solberg Aviation Co., 409 N.J. Super. at 311-12.

As we recognized in our 2009 opinion in this case, "'there may be situations where a court should not take at face value what the legislature has said'" as to the purpose of a condemnation action. Solberg Aviation Co., 409 N.J. Super. at 319 (quoting Franco v. Nat'l Capital Revitalization Corp., 930 A.2d 160, 169 (D.C. 2007)). Even "when the condemning authority's stated purpose is preservation of open space and the condemnation will likely achieve that purpose," a court may nonetheless "examine the stated public purpose of a condemnation when that condemnation infringes on an important state interest

or otherwise suggests a true purpose that is discriminatory or illegal." Id. at 319-20.

In MiPro, we considered the validity of an ordinance authorizing the acquisition of property within a municipality explicitly for purposes of open space, farmland, and historic preservation and parks and recreation, but where evidence showed that the motive underlying the ordinance was a desire to impede residential development. 379 N.J. Super. at 363. The particular parcel of property at issue, which had initially been intended for development of an assisted living facility with units available to low- and moderate-income residents, became a target for acquisition by the municipality only after it was sold to a developer who planned instead to construct twenty-three single-family homes. Id. at 365-66.

We concluded in MiPro that, even if the primary goal of the municipality's open space program had been to impede residential development, and the municipality had no immediate plans to put the property acquired to active use, the municipality's resort to the condemnation process to acquire the property for that purpose nonetheless did not constitute either bad faith or an abuse of its power of eminent domain. Id. at 375-76. We explained that the municipality's concerns for the consequences of residential development, including increased

traffic, pollution, and stress on municipal services, were legitimate, and that the condemnation served both the goal of addressing those legitimate concerns and the stated purpose of preserving open space. Id. at 376. But we cautioned that at issue there was "not a case in which a condemnation action ostensibly brought for a legitimate public purpose, such as acquisition of additional open space, was actually brought for a discriminatory reason or other improper motive." Id. at 377 (emphasis added).

Here, defendants asserted and presented evidence at trial of an improper purpose for the condemnation, namely that it was undertaken by the Township to prevent the expansion and improvement of the airport in a manner beyond the municipality's ordinary zoning authority. In our prior opinion, we made clear that, while the Township retained zoning power with respect to property comprising an airport, such power was "narrowly circumscribed." Solberg Aviation Co., 409 N.J. Super. at 307-08. The exercise of municipal authority must conform with requirements imposed by federal and state law and regulation regarding the location and operation of airports. Ibid. Even then, local power remains subject to override by state and federal aviation authorities. Ibid.

Before our remand, the trial court here initially granted summary judgment to the Township, concluding that defendants had failed to make a

sufficient showing that the condemnation had been undertaken in bad faith for that improper purpose. We reversed that motion ruling. Id. at 324. In doing so, we observed that, even considering the evidence in the light most favorable to the Township, there was no support for a finding that the condemnation of development rights to property within the airport facilities area would actually serve its stated purposes of preservation of open space, the airport, or community character. Id. at 312-14. We noted that the objective context suggested that the decision to condemn those rights had been tainted by an inappropriate desire to control the airport's operations. Id. at 314-15. We reached the same conclusion with respect to the Township's taking of title to any property within the airport's safety zone, adding that such action would not likely preserve any additional open space than would attend ordinary operation of the nearby airport. Id. at 315-16.

As we stated:

> In sum, defendants' evidence strongly suggested that the Township's true purpose in condemning the land within the airport facilities area and safety zone was to secure ultimate control over airport growth and expansion. Because this purpose is contrary to express State purposes and beyond the power delegated to the Township by the Legislature, the condemnation of any parcels falling within the facilities area or safety zone must be set aside and determined after a full hearing on the merits. If any parcels fall outside of the facilities

A-3964-15T4

area and safety zone, the condemnation of those parcels must be revisited consistent with MiPro.

> [Id. at 320 (emphasis added).]

We further noted that defendants could appropriately raise the issue of the public purpose served by the airport in establishing its claim for the arbitrariness of the condemnation. Id. at 322-23. Based on the then-existing summary judgment record, we noted that defendants had presented "substantial evidence," both of the existence of that purpose and its impairment by the condemnation, thereby raising a dispute of material fact necessitating trial. Id. at 323. Consequently, we directed that:

> As part of our previously ordered remand, the court must conduct a trial on defendants' arbitrariness claim. If the court determines that defendants have made a prima facie showing of arbitrariness, then the Township should be required to prove that the condemnation is reasonable and necessary. In analyzing the reasonableness of the condemnation, the court should consider the public purpose served by the airport as compared to the public purpose to be achieved through the condemnation. With regard to necessity, the court should consider the amount of open space already available to the Township, how defendants' property fits into the Township's existing plans for continuous greenways, and whether the Township's goals could be achieved with a lesser taking.
>
> [Ibid.]

The trial court carried out that direction and presided over a lengthy trial that spanned nearly a year. After meticulously considering the trial proofs, Judge Armstrong concluded in his detailed opinion that not only were there "substantial" indicia of bad faith and arbitrary conduct on the part of the Township (as we had preliminarily detected), but that the proofs clearly established such improper motives and arbitrariness. We uphold the judge's findings, affording them the due deference they deserve. We also agree with Judge Armstrong that the proven bad faith and arbitrariness taint the entirety of this eminent domain action, and not just a portion of it.

The Township's claims of evidentiary error do not warrant setting aside the judge's findings. The judge reasonably found that the Solbergs' intrafamily oppressed shareholder litigation has little or nothing to do with the issues presented in this case, or that it had any bearing upon the bona fides of the municipal decision to condemn defendants' property. The court did not misapply its wide discretion under N.J.R.E. 403 to exclude from this case the transcript from that separate lawsuit.

Nor are we persuaded that the judge was obligated to reject the testimony of defendants' aviation expert as inadmissible net opinion. The expert, a former Director of the State Division of Aeronautics, sufficiently provided the "whys

and wherefores" for her opinions about the airport's public purpose. Townsend v. Pierre, 221 N.J. 36, 54-55 (2015). We discern no abuse of discretion in the judge's admission and consideration of her expert views. In re Accutane Litig., 234 N.J. 340, 391 (2018) (reiterating that an abuse-of-discretion scope of review generally applies to appeal of evidentiary rulings by civil judges).

In affirming the trial court's findings of arbitrary and bad faith conduct that underlie the present eminent domain case, we must make clear, however, that we do so without prejudice to the Township's ability to pursue a future eminent domain action concerning portions of the Solberg parcel that is suitable in scope and not tainted by bad faith motives.

By way of analogy, this court similarly adopted a "without prejudice" disposition in the Glassboro v. Grossman case, in which we ruled that although the municipality had not shown in that case "reasonable necessity" to acquire the landowners' parcel, the municipality could bring a new complaint that was properly supported by such a showing of necessity. ___ N.J. Super. at ___ (slip op. at 26, 29-30). Similarly here, the Township is not precluded from bringing a future condemnation case based upon good faith motives and with non-arbitrary objectives and dimensions.

We reject defendants' assertion that the trial court's decision confers, in essence, a blanket and perpetual protection of their entire 700-plus-acre tract from the Township's eminent domain powers. To be sure, as we previously noted in our 2009 opinion, the "airport facilities" area and the "airport safety zone" portions of the property are presumptively insulated from condemnation, due to the preemptive federal and state regulatory authority over airports and aviation. But we cannot and need not offer more guidance than that about a future lawsuit that may never come to fruition. See Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107 (1971) (noting that our courts generally do "not render advisory opinions or function in the abstract").

We are acutely mindful that our 2009 opinion had anticipated that, on remand, the parties and the trial court would have been able to identify with precision and metes and bounds designations, "which, if any, of the seven parcels named in the Township's condemnation action fall outside of the airport facilities area and safety zone." Solberg, 409 N.J. Super. at 320. Unfortunately, on reflection, it appears that our premise of feasibility and our instruction in that regard was not easily or sensibly capable of being fulfilled.

Among other things, the proofs at trial showed that some of the areas outside of what might be considered such airport facilities and safety areas have

at times been used for the balloon events and other aviation-related purposes. The trial judge in his decision frankly noted that "[t]he evidence presented by both parties shows that there is continued uncertainty about whether any particular block and lot falls outside the airport's zone of operations." The judge added that "[s]uch specific determinations are contingent upon the final layout of the airport and the implementation of one of the proposed plans [for its future use or possible expansion]."

We now appreciate the practical difficulty the trial judge encountered in considering whether parcel-by-parcel clear lines can be drawn in determining what specific portions of the whole parcel are beyond the municipality's condemnation powers. As it turned out, the judge did not analytically need to resolve this parcel-designation problem because he determined that the complaint was invalid in its entirety due to bad faith and arbitrary conduct.

We respectfully decline the parties' request that we attempt to resolve this unresolved parcel-designation question ourselves on the present record, by invoking our discretionary original jurisdiction under Rule 2:10-5. Among other things, as Judge Armstrong reasonably perceived, the "continued uncertainty" stems largely from the uncertainty of the future plans for the airport and the policies and expectations of federal and state aviation officials. The record is

very stale on this point and is based upon documents from more than a decade ago, including a letter from a former NJDOT Commissioner who is now deceased. No current NJDOT or FAA officials testified at trial. It is highly speculative to presume that the quite-dated documentary record reflects what regulatory authorities now regard as the future appropriate role of this airport within the region's overall aviation scheme. Although we by no means encourage future litigation, we suggest that if another condemnation action is filed by the Township and contested by defendants, the court be supplied with testimony from one or more current aviation officials with responsibility for the airport.

In sum, we affirm the trial court's decision invalidating the present action and dismissing the Township's complaint, without prejudice to a possible future complaint.

### III.

We can address more succinctly defendants' cross-appeal on the tax assessment issue.

First, we reject defendants' position that the Township's eminent domain action exempted them from liability for real property taxes on the entire parcel, including the 102 acres within the airport facilities' zone. The EDA explicitly

A-3964-15T4

contemplates that a condemning authority may take less than a fee simple interest in property, as the Township here purported to do with respect to the airport facilities area:

> The title to property condemned and acquired by the condemnor hereunder, shall be a title in fee simple, free and discharged of all right, title, interest and liens of all condemnees, and shall include all the right, title and interest of each condemnee therein, provided, however, that if the complaint or any amendment thereof shall specify a lesser title, the lesser title so specified shall be the title condemned and acquired.
>
> [N.J.S.A. 20:3-20 (emphasis added).]

Where that situation is involved, for example, as with a leasehold or easement, our Supreme Court has explained that the condemnor may take that lesser interest "separate and apart from, and without the condemnation of, the fee simple." Town of Kearny v. Discount City of Old Bridge, Inc., 205 N.J. 386, 392-93, 405-06 (2011). The corollary is that, once condemnation is complete, the property owner continues to hold title, albeit to property that no longer includes the interests taken through the condemnation, and that taxes may continue to be assessed on the property accordingly. See Borough of Englewood Cliffs v. Estate of Allison, 69 N.J. Super. 514, 516-18, 530 (App. Div. 1961) (where property was restricted by terms of decedent's will to its use as a park for public benefit, property was not exempt from taxation, but assessment could

not "include elements of value . . . transferred to the community at large in the form of public rights"). The same result must obtain, as here, for the period that the declaration of taking remained in effect, even if the condemnation ultimately failed.

The trial court's conclusion that Solberg remained liable for property taxes on the 102-acre parcel comprising the airport facilities area was therefore sound. Defendants' arguments to the contrary provide no grounds for reversal.

We also reject the Township's contention that the incidental tax issues in this case were decided in the wrong forum and now must be transferred to the Tax Court. Given the idiosyncratic and unusually extensive nature of this marathon litigation dating back to 2006, we discern no reason to have the tax issues at this very late stage referred to a Tax Court judge.

That said, we do agree with defendants' contention that at least one aspect of the trial court's tax ruling requires modification. Their challenge to the amount of the assessment focuses solely on the value of the right to use the property's single-family residence, which Thor undisputedly used at least "at times" during the period the declaration of taking remained in effect.

The parties quarreled over whether the assessment should account for the use of that residence. Defendants argued that it should not, since the declaration

of taking made no explicit exemption for residential use. The Township contended that it should, noting that defendants nonetheless could and did enjoy continued use of the residence while the declaration of taking remained in effect.

Since the special master was not qualified to resolve this legal issue, he arrived at two separate valuations based on his research and the parties' submissions. He adopted a cost approach for both valuations, extrapolating the value of the land as of the relevant dates from contemporary sales of comparable properties, either with a residential right of use in the first instance or without that right in the second, and adding to those estimates the depreciated value of improvements represented by the structures found on Solberg's property. He then calculated the property taxes due based on those figures.

Following submission of the special master's report, the trial court concluded that the better approach was to value the property with a residential right of use. It acknowledged that the declaration of taking carved out no specific exemption for continued use of the residence, but believed that its actual "continued use during the period," to which defendants admitted, "require[d] that the tax assessment reflect as much." Further, it found that the special master's analysis, based on sales of properties on which a comparable single-

family house could be constructed, was sound, accepted his determination as adequate, and set the assessment accordingly.

Defendants maintain on appeal that the property should not have been assessed with a residential right of use. Relying on our opinion in the prior appeal, they assert that liability for taxation turned on the holding of title – rather than possession of the property – once the Township filed its declaration of taking. Because, as the trial court acknowledged, the declaration of taking did not explicitly leave defendants with a residential right of use, they reason that title to the property could not include such an interest and, consequently, that an appraisal of the value of the property must exclude that interest for taxation purposes.

Defendants acknowledge that the residence's physical structure does remain on the property, but note that the special master had included the value conferred by that structure in his appraisal of the property even without a residential right of use. They add that, because the determination whether to include the value of that right in the final assessment was a purely legal one, depending as it does on interpretation of the declaration of taking, the court's decision in that regard should not be entitled to any deference on appeal.

Defendants' argument concerning the tax treatment of the residence is correct. While it may be, as the trial court emphasized, that defendants continued to enjoy residential use of the property throughout the proceedings, we made clear in our prior opinion that the vesting of title and right of possession were distinguishable concepts under the EDA, and that liability for taxation turned on the former rather than the latter. Solberg Aviation Co., 409 N.J. Super. at 326, 329. As we have already discussed, liability must be limited to the value of the property retained by the taxpayer, see Estate of Allison, 69 N.J. Super. at 530, which may be ascertained here only from the declaration of taking.

The declaration of taking specifies that the Township sought to acquire only "development and easement rights" to the airport facilities area. But, rather than explicitly enumerating the rights it was thereby taking, which may have proved impossible as a practical matter, the Township instead explicitly enumerated the rights with which defendants would be left after the taking, specifically "conservation and passive recreational use, as well as agricultural use, airport uses and uses ancillary to a principal airport use." It appropriately then went on to identify which specific uses would be classified as ancillary to the principal airport use.

On its face, the declaration of taking left no authorized uses to defendants other than those enumerated, and none of the uses enumerated were residential. The consequence is that, while the Township never took physical possession of the structure and thereby prevented defendants from using it as a residence, the declaration of taking nonetheless removed a right to such use from the set of property interests comprising the title retained while the document remained in effect.

Because the assessment the trial court adopted, as a matter of law, does not reflect that restriction on the property, its judgment is reversed in that narrow respect. The matter is remanded for the limited purpose of fixing a modified assessment that excludes a residential right of use. No other issues may be raised on remand.

## IV.

We conclude with a parting observation. The present litigation has carried on for more than a dozen years. Presidents and Governors have come and gone. And babies who were born when this case started will soon become teenagers. During that time considerable public and private funds have been expended on the case, with many days of proceedings. Although we appreciate the fine advocacy of both sides, we respectfully suggest that, before any further litigation

is pursued, the parties might consider renewing their efforts to bring an end to this seemingly-interminable battle with an amicable resolution. If such a resolution is not desired or attained, however, the trial court is surely available for the filing of a new complaint.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3964-15T4